# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Carbon County Children and Youth    :
Services,    :
         Petitioner    :
   :    **CASE SEALED**
         v.    :    No. 533 C.D. 2014
   :    Submitted: September 26, 2014
Department of Public Welfare,    :
         Respondent    :


BEFORE:    HONORABLE BERNARD L. McGINLEY, Judge
              HONORABLE MARY HANNAH LEAVITT, Judge
              HONORABLE P. KEVIN BROBSON, Judge


OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE LEAVITT[1]                          FILED: October 19, 2015

       Carbon County Children and Youth Services (CYS) petitions for review of an adjudication of the Department of Public Welfare, Bureau of Hearings and Appeals (Department) expunging its indicated report of sexual abuse from the ChildLine Registry that named J.K. (Father) as a perpetrator.[2] CYS believes that its evidence proved the abuse, and the Department erred in adopting the recommended adjudication of the Administrative Law Judge (ALJ). CYS contends that the ALJ's adjudication contained a number of flaws. First, the ALJ who

---

[1] Reassigned to this author on February 13, 2015.

[2] ChildLine is a unit of the Department that operates a statewide toll free system for receiving and maintaining reports of suspected child abuse, along with making referrals for investigation. 55 Pa. Code §3490.4. The ChildLine Registry is maintained in accordance with the Child Protective Services Law, 23 Pa. C.S. §§6301-6386.

drafted the recommended adjudication did not conduct the evidentiary hearing and, thus, erred in making the critical credibility determinations on a cold record. Second, the ALJ erred by referring to a court proceeding between the parents of the victim over custody of the victim's younger brother. Third, the ALJ erred in not discussing the testimony of Father's expert, a psychologist, who, *inter alia*, identified the factors that indicate when a child's allegations of abuse are the product of taint. Finally, the ALJ erred because the clear and convincing standard of proof is no longer the correct standard to apply in an expungement appeal. We agree with CYS on this final issue, and on that basis vacate the adjudication and remand for application of the statutory standard of proof.

## Background

On April 4, 2011, D.K. (Mother) contacted CYS to report that her 7-year-old daughter, M.K. (Child) had been abused by Father, who is Child's stepfather. On May 26, 2011, CYS filed an indicated report with the Department naming Father as a perpetrator of child sexual abuse. The report stated that between January and March 2011, Father instructed Child to take off her clothes and "lick perpetrator's pee-pee." Certified Record, Item No. 3, Exhibit C-2. The CYS report noted that Father denied the abuse, but it found Child's contrary statement of abuse credible. After Father learned that he had been identified on the ChildLine Registry as a perpetrator of sexual abuse, he appealed to the Department.

2

The Department appointed Barbara Shade Nause, Esq., to conduct the "Fair Hearing,"[3] which took two days. The first hearing took place on March 27, 2013, at which CYS presented its case. The second day of hearing took place on May 13, 2013, at which Father presented his case.

The first order of business concerned the admissibility of evidence. The ALJ considered whether to admit a digital video disc (DVD) recording of a forensic interview of Child that was done on April 6, 2011, and whether Child, who was nine years old at the time of the hearing, was competent to testify. To resolve those questions, the ALJ interviewed, by telephone, Kristen Fetcho, the forensic interviewer, and Child, in person.

Fetcho stated that she holds an undergraduate degree in sociology and has ten years' experience as a forensic interviewer with the Scranton Child Advocacy Center. Fetcho explained that "[w]e pretty much do relatively blind interviews," which means "[w]e might know if they were sexual abuse allegations or physical abuse allegations, but we get the specifics from the child." Notes of Testimony of March 27, 2013, at 18 (N.T. 3/27/13 at ___). Fetcho also explained that the Child Advocacy Center uses open ended questioning of child victims. *Id.* at 19. Fetcho did not remember the questions she put to Child, and she had never viewed the DVD of the 2011 interview; accordingly, she used her written summary to answer the ALJ's inquiries. Father objected to the DVD because Fetcho could not remember her interview of Child and could only testify about general practices

---

[3] A "Fair Hearing" is another name for an expungement hearing or a perpetrator's appeal of the maintenance of an indicated report of child abuse on the ChildLine Registry. Board Adjudication at 3.

of the Child Advocacy Center.  The ALJ overruled the objection and admitted the DVD.

Next, the ALJ questioned Child to determine her competency.  Child responded to the ALJ's inquiries about truth and falsehood by stating that not telling the truth would get Child "in trouble."  N.T. 3/27/13 at 31.  When asked if she knew why she had "to talk about [Father]," she responded "yes."  N.T. 3/27/13 at 32-33.  The ALJ then questioned Child as follows:

Q. Can you tell me [what]?

A. Because he was doing something that he wasn't supposed to do.

Q. "He was doing something that he wasn't supposed to do."

A. And it was really inappropriate.

Q. "And it was really inappropriate."  Okay.  Do you remember when that occurred?

A. No.

Q. Do you remember how old you were?

A. No, I can't remember.  It was awhile ago.

Q. "It was awhile ago."  Do you remember what time of year it was?

A. No.

Q. Do you remember what grade you were in?

A. I can't remember.

Q. You can't remember.  Do you remember where the inappropriate behavior happened?

A. Yes.

4

> Q. Okay. Do you remember how many times the inappropriate stuff happened?
>
> A. No.

*Id.* at 32-33. After the ALJ questioned Child, Child was removed from the room and the parties were given an opportunity to present argument.

Father's counsel challenged Child's competency for several reasons. In response to the ALJ's questioning, Child was not able to recall the "inappropriate" things done by Father with any specificity. More critically, after a two-day court hearing that took place six months earlier to determine Child's competency to testify about Father's alleged abuse, the court ruled Child to be incompetent. In that competency hearing, Child repeatedly told the judge that she could not remember what Father did. Father's counsel cited the transcript where the judge asked Child if she "can recall those things that you're saying that [Father] did that were wrong," and she responded no. N.T. 3/27/13 at 38. Father's counsel argued that if Child's memory was deficient six months ago, it could only have deteriorated since then, and this point was corroborated by the fact that in spite of spending days with Father's counsel in that hearing six months earlier, Child told the ALJ that she had no memory of having ever seen Father's counsel.[4]

CYS argued that Child was competent to testify based on her age. Further, although Child did not remember when the abuse occurred, she did remember "that it occurred" and expressed a willingness to talk about it. N.T. 3/27/13 at 36. CYS argued that it was fear that had impeded her ability to speak to the judge.

---

[4] Counsel for Father and for CYS were present during the ALJ's competency evaluation; neither counsel questioned Child.

The ALJ found Child competent to testify. The ALJ explained that Child knew the difference between the truth and a lie, could answer questions and had "some recollection of what occurred." *Id.* at 39.

The first witness called by CYS was Child. After being instructed by the ALJ to tell the truth, Child testified on examination by CYS. Child described the "big" house where she used to live with Mother, her younger brother, J.K. (Brother) and Father. *Id.* at 41. CYS' counsel continued the inquiry:

> Q. Can you tell me again why you think you're here today?
>
> A. Because I have to tell the truth about what happened.
>
> Q. Do you remember…. What are you talking about, 'what happened?'
>
> A. Like, what [Father] did to me.
>
> Q. Do you remember what house – do you remember where you were when this happened?
>
> A. Yes.
>
> Q. Where were you?
>
> A. Upstairs in the attic, also known as my mom's room or the office.

N.T. 3/27/13 at 41-42. Child did not remember the season "this happened." *Id.* at 42. The questioning continued:

> Q. Can you tell me what happened?
>
> A. He was doing inappropriate things.
>
> Q. What do you mean, 'inappropriate things'?
>
> A. Like things with my private parts of my body.
>
> Q. Okay. I know it's tough, but can you tell me what he did?

6

A.    Uh-huh.  He was asking, like, me to do things with my pee-pee.

Q.    Like what?

A.    Like, I can't really explain it.  It's hard for me to.

Q.    Okay.  Was there anything else that happened?

A.    [Brother] was there, too, and he was showing me videos of it.

Q.    Who was showing you videos?

A.    [Father].

Q.    How was he showing you the videos?

A.    He had his phone and he was showing it to me. He told me if I would do it, then he would let me play a game on the computer.

Q.    Do you remember who was in those videos?

A.    I don't know.

Q.    Was it boys?  Was it girls?

A.    Both.

Q.    Do you know what they were doing?

A.    Inappropriate stuff.  I don't really know what it was called.

Q.    Okay. Can you describe what it was?  I mean, if you don't know the terms, can you try to explain it to me?

A.    They were doing stuff with their pee-pee's.

Q.    Who was doing stuff?

A.    The people in the videos.  And he was telling me to do it too.

Q.    Do you remember how many times that happened?

7

A.      No.

N.T. 3/27/13 at 42-44.

Child then explained that Brother often used Father's cellular phone to watch cartoons. One day, when Brother tried to watch a cartoon on Father's phone, an inappropriate video came on. Mother saw the video and questioned Child about it:

Q.      What did you tell your mom?

A.      Everything that happened.

Q.      And what do you mean, 'Everything that happened'? What happened?

A.      The inappropriate stuff.

Q.      How did you know it was inappropriate?

A.      My mom told it to me. Like, it's inappropriate for him to do that.

THE COURT: It's inappropriate for?

A.      For, like, that to happen.

THE COURT: 'For that to happen'

A.      He shouldn't be doing it.

N.T. 3/27/13 at 46-47. Child was not more specific about "the inappropriate stuff."

On cross-examination, Father's counsel asked Child if she remembered him from the prior court proceeding. Child responded that she did not remember him although she remembered the court proceeding. She said that she did not speak on that occasion because she was afraid.

Child stated that she saw the videos on her Father's phone more than once in the attic. Sometimes her brother was present, but sometimes it was just her

8

and Father. She testified that Mother was always in the house, downstairs, when this occurred. N.T. 3/27/13 at 67-68.

On re-direct examination, the questioning continued:

Q. [D]o you remember what was in the video, what happened in the video?

A. Yeah.

Q. Can you tell me?

A. They were doing inappropriate things with their pee-pee's.

Q. And after watching that video, did [Father] ever ask you anything?

A. Uh-huh.

Q. What did he ask you?

A. He asked for me to do that.

N.T. 3/27/13 at 69. Child then stated that she "did what the video did." N.T. 3/27/13 at 70. She described it as touching Father "near his private spot." N.T. 3/27/13 at 71. When asked what Father's private spot looked like, she stated "I don't really know" and "I don't really want to explain it." N.T. 3/27/13 at 71-72.

CYS also asked Child if Father touched her. She responded that he touched her "private spot" more than once. N.T. 3/27/13 at 72. She testified that she did not have clothes on when this happened. It did not hurt when Father touched her private area, but once he hit her in the face and that hurt.

On further cross-examination, Child testified that she touched Father's private parts and "lick[ed] by his private parts." N.T. 3/27/13 at 77. She refused to describe Father's private parts. She stated that when Brother was present, he just sat on the staircase.

9

Mother next testified through a Polish speaking interpreter. Mother acknowledged that she could speak and understand English, "but in court, everything's taken literally, so interpreter helps me to express what I really want to say." N.T. 3/27/13 at 97.

At the time of the hearing, Mother resided with her mother; Child; Brother; and a stepdaughter from a prior marriage. Mother worked as an emergency medical technician for an ambulance service.

Mother met Father in 2006, when Child was two years old. They married shortly thereafter, but divorced one year later. In 2008, they reconciled, Mother became pregnant, and they remarried. Mother stated they were "happily married," until she learned of the abuse. N.T. 3/27/13 at 94. She planned to divorce Father when she could afford it.[5]

Mother testified that in 2010 she began to have issues with Child's behavior. Child "couldn't sleep, so she was falling asleep at school." N.T. 3/27/13 at 93. Child "couldn't concentrate on anything and she couldn't do her homework. [She] was hiding under the table and she wouldn't listen to me. [Child] didn't want to talk to me like she usually would talk to me, and her grades dropped a lot in school." *Id.*

Mother explained that in April 2011, she found Brother watching pornography on Father's cellular phone. Child was not present at the time. When Child came home from an overnight stay at a friend's house, Mother asked her if she had ever watched videos of naked people on Father's phone. N.T. 3/27/13 at 92. Child replied that Mother should talk to Father about it. Mother testified that

---

[5] However, Father has filed for divorce. N.T. 5/13/13 at 126.

10

Child told her she had a "secret" with Father and when Mother inquired further, Child told Mother that she saw Father naked and that Father instructed her to lick his pee-pee. *Id.* at 92-93.

On cross-examination, Mother acknowledged that she had been in a custody dispute with Child's biological father, who was only permitted supervised visits with Child, at the requirement of CYS. Mother also agreed that she did not witness anything sexual between Child and Father. She called the police on the occasion Father had hit Child in the face. She also quarreled with Father for buying Child too many presents. The ALJ disallowed cross-examination on charges of sexual abuse made by Mother against other persons.

When the hearing resumed two months later, Father first offered the testimony of Ronald Esteve, Ph.D., a clinical psychologist, who was appointed by the court in a custody proceeding to evaluate both Father and Mother, the parents of Brother. The evaluation involved extensive interviews of both parents and observations of Brother interacting with each of his parents. Dr. Esteve did not interview Child or view the DVD of Child's forensic interview because Child was not involved in the custody dispute.

Dr. Esteve has extensive experience in child abuse and works for the children and youth services agencies of several counties. Father offered Dr. Esteve's testimony to support Father's position that Child's testimony had been tainted by Mother and that Father lacked the psychological markers of a pedophile. Dr. Esteve acknowledged that Father was compensating him for his appearance at the Department's Fair Hearing. Dr. Esteve noted that he became involved with Father and Mother as a court-appointed neutral expert in the dispute over Brother's

11

custody; he could not recall who paid for that work. Dr. Esteve stated that the identity of the payor does not influence his professional judgment.

Dr. Esteve testified about what he looks for in determining whether a child's account about abuse has been "tainted." N.T. 5/13/13 at 27. Dr. Esteve stated

> children who have been tainted, whether purposefully or unwittingly, typically don't demonstrate a great deal of emotional difficulty in describing whatever the events are that they want to describe.

*Id.* They have minimal affect and use adult language to describe events, and "they also will typically describe that information relatively quickly. In other words, they're describing very intense emotions, but they're describing it right up front and, again, almost as if they want to get it out of the way." *Id.* at 29.

Dr. Esteve further explained that a child who has been traumatized will have a difficult time talking about the incident and will talk about it only after developing a strong and trusting relationship with the interviewer. He explained that "normally, … it's very difficult [for a child] to talk about [the trauma]." *Id.* at 28. On the other hand, one may infer taint where the child discloses

> what most individuals would recognize as very powerful information relatively quickly to an individual that they don't know or don't know well and certainly don't have a strong and trusting relationship with.

*Id.* Young children whose testimony has been tainted "will use language that's not their own, language that, in essence, has been presented to them by other individuals ... when asked very specific points, they are more likely to have difficulty." *Id.*

12

Dr. Esteve testified that when he asked Mother how the sexual abuse allegations had come to light, she volunteered that the first question she asked of Child was whether she had been "inappropriately touched by [Father]." *Id.* at 31. Dr. Esteve stated that this question was tainted by "confirmation bias," meaning that it sought a confirmation of the questioner's belief. *Id.* at 32. Such a question, he noted, immediately produces fear in the child. Further, the child wants to please a parent and will "be very sensitive to what they perceive as expectations and try to fulfill those expectations." *Id.* at 33.

Dr. Esteve next addressed the question of whether Father was a pedophile. Dr. Esteve conducted extensive interviews of Father and of Brother, together and separately. With respect to his interviews of Father, he stated:

> Certainly he has some difficulties, and I think it's reasonable to say that he presented with some degree of defensiveness in all of his contact with and interviews with me.
>
> His defensiveness was rather sophisticated, typical of an individual who is socially sophisticated and relatively bright; and it's often consistent with an individual who is trying to be very careful. It's also very consistent with the way relatively bright individuals present in custody evaluations.

N.T. 5/13/13 at 36-37.

Dr. Esteve opined that Father did not show the correlates of a pedophile. For example, Father, who was 46 years old at the time of the alleged abuse, had no prior history of abuse. Father did not exhibit signs of paranoia, arrogance, narcissism, unreasonable anger, rigidity, hypervigilance, or drug and alcohol abuse, which are all correlates. Other correlates are employment difficulties, difficulty interacting with peers, lack of impulse control, low frustration tolerance and social isolation; none of these applied to Father.

13

Dr. Esteve acknowledged that Father did possess one correlate: he had been raped at the age of 14.[6] Dr. Esteve noted that conventional wisdom holds, mistakenly, that persons abused sexually as children will grow up to abuse children. Dr. Esteve explained that the number of pedophiles who were sexually abused as children is a relatively high number, but the number of abused children that grow up to be abusers is a very low number, *i.e.*, "typically less than 1 percent of those people go on to become abusers. So, it's a very weak statistic." N.T. 5/13/13 at 38.

Father testified. Father responded to Child's testimony at the Fair Hearing, her statements during the forensic interview and to Mother's testimony. He offered a completely different version of what happened in the family.

He stated that when he first met Mother, Child was 2½ years old. Father and Mother married within a few months of meeting, but they soon divorced. Mother contacted him the following year, and they reconnected. They remarried when Mother become pregnant.

Father stated that he entered the second marriage debt free. Soon thereafter, they purchased a house and began an expensive remodeling. Because of Mother's constant purchases, he had incurred debt in the amount of $100,000 in addition to the mortgage. N.T. 5/13/13 at 71. He is presently bankrupt, having lost his business when police seized his computer because Mother claimed, falsely, that it contained child pornography. N.T. 5/13/13 at 108-09.

Father stated that a couple days before Mother accused him of abusing Child, she had asked for $10,000 to help her brother. He replied that this would

---

[6] Father was raped by a male truck driver while hitchhiking.

14

take him time. The next day, after Father installed new antique brass door handles and locks on the outside doors as she had requested, Mother asked him if he had sexually molested Child. Child was present during this conversation; Father told Child to tell the truth. Mother then telephoned 911 and screamed for the police to come. She told the police that Father was sexually abusing the children and had child pornography on his computer, which police seized.[7]

Father explained that Brother played video games and watched cartoons on Father's cellular phone. Father admitted that he had installed adult pornographic videos on the phone, but he thought he had hidden them. One night, when he discovered that Brother had found one of the pornographic videos, he took the cellular phone from Brother and told him he could not watch it. Mother was present during this incident and did not express any concern. Because Brother had found the videos, Father suggested that they ask Child if she had also discovered it. Mother told him not to worry about it; she would address it with Child.

Father testified that Mother was constantly berating Child, would lock Child outside of the house and tell her to find new parents. To protect her from these outbursts, Father told Child that when Mother blamed her for something, she should state that Father had given her permission to do it. This was the "secret" he had with Child. N.T. 5/13/13 at 75.

Father testified that Mother has accused Child's biological father of sexual abuse of Child. N.T. 5/13/13 at 103-04. She also made accusations of pedophilia against the judge involved in Brother's custody case and a urologist

_____

[7] Father was charged criminally for sexual abuse of Child, but all charges were dismissed at his preliminary hearing. He was not charged with possession of child pornography.

15

who had examined Child, which accusations she posted online. N.T. 5/13/13 at 93, 101, 110.

Father testified that he took care of Child, whom he regarded as his daughter.

> I took -- I did a personal daily living routine with [Child]. I've had to give her baths. She's 7. There's nothing sexual about a 7-year-old, okay? This was my daughter. I considered her my daughter. I took care of her. I raised her from the age of 2. She -- she -- it killed me to sit in the other room and hear her call me [by my first name] instead of daddy, because she has never called me [by that name]. She's called me daddy.
>
> I had her on my shoulders. I took her and [Brother] everywhere. They're my children. I love them dearly. I don't let nothing hurt them.
>
> * * *
>
> If you want to find out who the perpetrator of [abuse of Child] is, it's not me.
>
> I've never hurt my daughter. I never would hurt my daughter. She took my last name. I put her in the best school. I took care of her.
>
> I watched -- my wife was out doing whatever. My wife did not work, and then she put my kids in childcare. I have no idea what she did with her day. I'm the one who took care of the kids.

N.T. 5/13/13 at 105. Father has no custody or visitation rights with respect to Child, to his regret. *Id*. at 130. However, he has 50 to 51 percent custody of Brother, which has been appealed to the Superior Court. *Id.*

The ALJ sustained CYS' objection to Father's testimony that Mother also accused Child's physician of sexual abuse and directed Father's counsel to

16

"move on from this point of questioning forward, please." N.T. 5/13/13 at 112. Father's counsel then asked:

> Q. Did you ever inappropriately touch [Child]?
>
> A. Not at all, no.
>
> Q. Describe to me -- was there ever an incident where she would have been confused at all?
>
> A. Yes, a very specific one that I told [Mother] about and which, I believe, [Mother] used against me.
>
> Q. What was that?
>
> A. And this was before [Mother] accused me of having sex with [Child], which is obviously not true.
>
> [Child] had -- has routine -- has urinary tract infections. [Child], as a result, has lost one half of her kidney, one half of her left kidney. In the process, she would get rashes or turn red. And after baths, we'd put cream -- whoever gave the kids a bath would put cream on her.

*Id*. On one occasion, the cream fell off his hand and hit Child's labia, causing her to scream. In the process of removing the cream, he bent down. "My nose was down." *Id.* at 113. Father believed this explained Child's statement during the forensic interview that his nose went in her. Finally, Father testified as follows:

> Q. And just so it's, I guess, clear: Did you ever put your mouth on --
>
> A. No.
>
> Q. -- on her vagina?
>
> A. No. Not -- not -- no. The only time I ever came near her was that time I was cleaning her out. I don't -- I -- I mean, I've put her on my head -- no -- but I've never -- No. I've never -- I've never done anything that either I

17

or anybody else in this room would consider sexually inappropriate, if they were there.

N.T. 5/13/13 at 130.

Father testified that Jill Geissinger, from CYS, asked him to provide information that might explain Child's statement. Geissinger told him that "she was trying to understand what [Child] might have misconstrued." N.T. 5/13/13 at 118. In response, Father submitted a written list of pornography on his cellphone, which included a description of the video content.

Geissinger, a caseworker with CYS, testified as the only rebuttal witness for CYS. She testified that on April 4, 2011, she received Mother's report of sexual abuse allegations against Father. N.T. 5/13/13 at 134. Father called Geissinger on April 7, 2011, and told her that "he had pornography on his phone [because Mother] was, pretty much, withholding sex from him and he was able to view the pornography and masturbate and meet his needs, and he felt that [Child and Brother] may have seen the pornography on his phone accidentally." *Id.* at 135. She asked Father about the pornography videos on his phone, and he submitted a written list. However, she denied asking, specifically, for this list.

Geissinger thought that Mother was credible. However, she also acknowledged that Father had been "pretty cooperative" and that Father's reports caused her to have concerns about Mother's mental health. *Id.* at 144, 150. Geissinger stated that she supervised "a lot of visitation between [Father and Brother] and … could see that [Father] was concerned and playful and – and, you know, the visits went well." *Id.* at 148.

After the hearings were concluded, a second ALJ, James Bobeck, Esq., reviewed the record and issued the recommended adjudication. He

18

recommended that Father's appeal be sustained and the indicated report be expunged from the ChildLine Registry.

The ALJ found Father and Geissinger credible and found Child and Mother not to be credible. He found that Child's testimony was

> not credible on the basis that it appears tainted and influenced to some extent by the actions and comments of other persons and very possibly initiated by her own mother. Therefore it cannot be found credible.

Recommended Adjudication, March 4, 2014, at 12. Finding that Child's testimony was "orchestrated" by Mother, the ALJ observed that, in the course of a bitter custody dispute over Brother, Mother had repeatedly lied and made false accusations that led to her being held in contempt of court. The ALJ concluded that the evidence

> demonstrates a clear pattern of other people around [Child] either telling her that she was right to speak about the allegations, that [Father] was bad, that [Child] [should] continue to say the allegations, and [Child's] own testimony became more affirmative as time passed.

Recommended Adjudication at 12. He found that Mother

> was the person who told [Child] that the abuse was "inappropriate" and "shouldn't be done;" which [Child] then echoed several times at the Fair Hearing by calling [Father's] behavior "inappropriate."

Recommended Adjudication at 12.

The ALJ also found Child not credible because she could not recall "the year, date, season or general weather conditions around the time of the alleged abuse." Recommended Adjudication, Finding of Fact No. 20. In addition, Child did not remember "if [Father] ever gave her a bath or asked her to take off her

clothes in any other situation other than when the alleged abuse occurred." Recommended Adjudication, Finding of Fact No. 21. Finally, "[Child] did not know what [Father's] 'private spot' looked like and did not want to explain what it looked like." Recommended Adjudication, Finding of Fact No. 14.[8]

The ALJ reviewed the DVD of the forensic interview and found it not reliable because of Fetcho's "affirmations." Specifically, the ALJ explained:

> While the interview was open ended in its questioning, it ended with many affirmations by the CYS of [Father's] alleged "wrong" actions and that [Child] was doing a great job by telling CYS these allegations and that she must continue telling these allegations to other people so they will know of [Father's] bad behavior.

Recommended Adjudication at 11.

Relying on this Court's decision in *G.V. v. Department of Public Welfare*, 52 A.3d 434 (Pa. Cmwlth. 2012), *rev'd,* 91 A.3d 667 (Pa. 2014) (*G.V. II*),[9] ALJ Bobeck concluded that CYS's burden was to prove by "clear and convincing" evidence that the sexual abuse took place. He explained why CYS did not satisfy that burden:

> However, examining the testimony, the testimony is not remembered so distinctly or so clear and convincing that the

---

[8] Child could not describe Father's genitals at the Fair Hearing; however, she did so at the forensic interview. In that interview, Child disclosed that Father's genitals were the same as her brother's except that Father's had hair. CYS argues that any lapses in Child's memory at the hearing were attributable to Child's youth and trauma.

[9] In *G.V. II*, four days after the Department issued its final order in this matter, the Supreme Court reversed this Court's holding that CYS must make its case under the "clear and convincing" standard of proof. The Supreme Court held that the statutory standard set forth in Section 6303(a) of the Child Protective Services Law, 23 Pa. C.S. §6303(a), governs expunction hearings and establishes the standard of proof, which is not the clear and convincing standard of proof.

undersigned can come to a clear conviction. In this case, the testimony and the circumstances surrounding the testimony demonstrate a strong likelihood of testimony that was tainted and influenced to some degree by the actions and comments of other people around [Child].

Recommended Adjudication at 12 (internal footnote omitted).

On March 4, 2014, the Department adopted in its entirety the recommended adjudication. On March 13, 2014, CYS filed an Application for Reconsideration, which was denied by the Secretary of Public Welfare.

## Appeal

On appeal,[10] CYS raises five assignments of error by the Department. First, CYS contends that its evidence proved abuse. Second, it contends that ALJ Bobeck, who issued the recommended adjudication, could not make credibility determinations because he did not preside over the evidentiary hearing and, thus, did not have the opportunity to observe witness demeanor. Third, CYS contends that the Department's irrelevant findings about a custody battle between Father and Mother prejudiced the outcome. Fourth, it contends that the Department erred in omitting any discussion of Dr. Esteve's testimony, which it believes supports the indicated report. Finally, CYS contends that the Department erred in applying the "clear and convincing" standard of proof.

---

[10] This Court's review determines whether constitutional rights were violated, whether errors of law were committed, or whether necessary findings of fact are supported by substantial evidence. *A.P. v. Department of Public Welfare*, 98 A.3d 736, 741 n.2 (Pa. Cmwlth. 2014). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Fiore v. Department of Labor and Industry*, 585 A.2d 994, 996 n.2 (Pa. 1991).

## Child Protective Services Law

An expungement hearing, or "Fair Hearing," determines the accuracy of information in an indicated report. Section 6341(c.2) states, in relevant part, as follows:

A hearing shall be scheduled according to the following procedures:

(1) Within ten days of receipt of an appeal pursuant to this section, the department shall schedule a hearing on the merits of the appeal.

(2) The department shall make reasonable efforts to coordinate the hearing date with both the appellee and appellant.

(3) After reasonable efforts required by paragraph (2) have been made, the department shall enter a scheduling order, and proceedings before the Bureau of Hearings and Appeals shall commence within 90 days of the date the scheduling order is entered, unless all parties have agreed to a continuance. Proceedings and hearings shall be scheduled to be heard on consecutive days whenever possible, but if not on consecutive days, then the proceeding or hearing shall be concluded not later than 30 days from commencement.

(4) The department or county agency shall provide a person making an appeal with evidence gathered during the child abuse investigation within its possession that is relevant to the child abuse determination, subject to sections 6339 (relating to confidentiality of reports) and 6340 (relating to release of information in confidential reports).

(5) The department or county agency shall bear the burden of proving by substantial evidence that the report should remain categorized as an indicated report.

23 Pa. C.S. §6341(c.2).

The accuracy of a report turns, in large part, on the credibility of testimonial evidence. *R. v. Department of Public Welfare*, 636 A.2d 142, 144-45 (Pa. 1994). The county agency bears the burden of proving that the actions of the alleged perpetrator constitute child abuse within the meaning of the statute. *B.J.K. v. Department of Public Welfare*, 773 A.2d 1271, 1275 (Pa. Cmwlth. 2001). This is done with substantial evidence of abuse that outweighs contrary evidence. Specifically, Section 6303(a) defines "substantial evidence" as:

> [e]vidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion.

23 Pa. C.S. §6303(a).

To meet this standard, "the child's testimony must be of such a quality" to allow the factfinder to conclude that it outweighs inconsistent evidence. *In re S.H.*, 96 A.3d 448, 462 (Pa. Cmwlth. 2014). *In re S.H.* considered the application of the statutory standard to a case where the child victim's testimony formed the sole basis for the finding of sexual abuse, *i.e.*, there was no physical evidence of abuse. Under the statutory standard of proof, we explained, first, that all of the child's testimony must be considered, not just the selective parts that described abuse. Second, testimony that provides information that is generally outside the knowledge of a young child is probative of abuse.[11] Third, the child's

---

[11] A child's statements about sexual acts, generally outside the knowledge of a young child, will be probative of sexual abuse. In *In re E.A.*, 82 A.3d 370, 372 (Pa. 2013), a young child used a doll to illustrate a sexual act. In *D.W. v. Department of Public Welfare*, (Pa. Cmwlth., No. 922 C.D. 2013, filed March 11, 2014), a six-year-old child produced an anatomically correct drawing of a penis. This standard has little value here because Child was exposed to pornographic videos.

23

statement of abuse must not be elicited by leading questions and should be free of pre-hearing coaching.

It is axiomatic that the Department is the factfinder in expungement appeals and responsible for credibility determinations. *F.V.C. v. Department of Public Welfare*, 987 A.2d 223, 228 (Pa. Cmwlth. 2010). Pointedly, the Pennsylvania Supreme Court has explained:

> Credibility determinations are within the exclusive province of the [factfinder] and findings of fact can be overturned only if they are arbitrary and capricious.
>
> ***
>
> The weight to be accorded the various statements made by Appellant and their credibility is exclusively a function for the finder of fact and not the reviewing court …. [T]he Commonwealth Court exceed[s] its scope of review [where it] substitute[s] its judgment as to the credibility and weight to be given [the] testimony[.]

*Lehigh County Vo-Tech School v. Workmen's Compensation Appeal Board (Wolfe)*, 652 A.2d 797, 800-01 (Pa. 1995).

A child's accusations of abuse must be evaluated carefully in light of the fact that a child is vulnerable to adult influence. "Taint" is defined as

> the implantation of false memories or the distortion of real memories caused by interview techniques of law enforcement, social service personnel, and other interested adults, that are so unduly suggestive and coercive as to infect the memory of the child....

*Commonwealth v. Delbridge*, 855 A.2d 27, 35 (Pa. 2003). In *Delbridge*, the Supreme Court explained that a child's testimony is incompetent "*where there is some evidence that improper interview techniques, suggestive questioning, vilification of the accused and interviewer bias may have influenced a child*

24

*witness* to such a degree that the proffered testimony may be irreparably compromised." *Id.* at 39 (emphasis added). If witness's memory of the event has been tainted, this renders the testimony about the event incompetent. *Id.* at 40. *A fortiori*, if testimony is incompetent, it cannot be found credible.

**Analysis**

CYS contends that it proved that Father abused Child because Child stated on direct examination that Father made her do the "stuff" she saw people doing on his cellphone; that she was naked; and that this "stuff" took place in the attic at the family home. Child stated that she touched Father's private parts, although she could not describe what she meant by "private parts." N.T. 3/27/13 at 77-78. For this testimony to have probative value, it must be found credible. ALJ Bobeck did not believe Child or Mother but did believe Father and the CYS caseworker, Jill Geissinger.

Regarding credibility, CYS acknowledges in its brief that "credibility determinations in expungement proceedings are made by the factfinder and are not subject to appellate review." CYS Brief at 17. However, CYS argues that ALJ Bobeck's credibility determinations should be redone because ALJ Nause observed the witnesses as they testified. By contrast, ALJ Bobeck's credibility determinations were made "on a cold record," and, as such, must be rejected. *Id.* We disagree.

In *R. v. Department of Public Welfare*, 636 A.2d 142, an alleged perpetrator of sexual abuse argued that he was denied due process because the Department made credibility determinations about witnesses that it did not see or hear testify. The Supreme Court rejected this argument:

> [T]he Office of Hearings and Appeals functions as the finder of fact in expungement hearings. It was designated as such by the

25

> Secretary of the Department of Public Welfare, 55 Pa. Code §3490.106(c), who is authorized to appoint a designee to perform her statutorily assigned duties to find facts and decide whether to expunge an indicated report.
>
> Because the Office of Hearings and Appeals, not the hearing examiner, is the ultimate finder of fact in this case, it is of no moment that the hearing examiner who issued the Adjudication and Recommendation did not hear the testimony given during the first four days of hearings. The hearing examiners are assistants who are constitutionally permitted to help the agency by taking, sifting through, and analyzing evidence. The critical issue is whether there are sufficient safeguards, as measured by *Peak* [*v. Unemployment Compensation Board of Review*, 501 A.2d 1383 (Pa. 1985)], to protect against arbitrary action by the Office of Hearings and Appeals.

*R.*, 636 A.2d at 145 (internal citations and footnote omitted). In short, the Bureau of Hearings and Appeals is the ultimate factfinder, not the ALJ. Here, the Bureau adopted the credibility determinations of ALJ Bobeck, who issued the recommended adjudication.

ALJ Bobeck did not observe the witnesses testify, but this does not mean that he could not make credibility determinations. It means only that he had to explain his credibility determinations by identifying his reasons for accepting or rejecting a particular witness's testimony. *McElwee v. Southeastern Pennsylvania Transportation Authority*, 948 A.2d 762, 774 n.10 (Pa. 2008). Notably, in *Casne v. Workers' Compensation Appeal Board (Stat Couriers, Inc.)*, 962 A.2d 14, 19 (Pa. Cmwlth. 2008), this Court further explained that "even where [the factfinder] has based a credibility determination on a cold record, substantial deference is due."

Here, ALJ Bobeck explained his credibility determinations in some detail:

> [T]he record demonstrates that the alleged abuse first came to light when [Mother] found pornography on [Father's] phone.

26

[Mother] questioned her children about the pornography on the phone, which they saw. There is no dispute that the children saw pornography on [Father's] phone. However, [Mother] then began asking [Child] if [Father] had sexually abused her, from which [Child] allegedly responded that [Father] had sexually abused her.

When [Child] spoke with Ms. Fetcho, [Child] thought that [Father] had licked her. It is noted that this interview took place only a month after the alleged time frame for the sexual abuse. [Child] thought [Father] licked her because his nose and chin were by her vagina. *After the interview, Ms. Fetcho told [Child] that she was a hero, that she did not do anything wrong, that her dad was bad, and that [Child] needed to help her tell other people about the bad things that her father did.* While the interview was open ended in its questioning, it ended with many affirmations by [Ms. Fetcho] of [Father's] alleged "wrong" actions and that [Child] was doing a great job by telling CYS these allegations and that she must continue telling these allegations to other people so they will know of [Father's] bad behavior.

The affirmations become important because at the time of the Fair Hearing which took place almost two years later in March 2013, *[Child] testified definitively that [Father] licked her.* Furthermore, during this two year time period, [Mother] made false accusations of child pornography possession against [Father], which were unfounded. [Mother] also first told [Child] that the behavior was inappropriate. Furthermore, a very contentious and protracted custody battle between the [Father] and [Mother] continued. It is also noted that [Child] testified that [Father] only hurt her when he hit her once, and that [Mother] was the person who told [Child] that the alleged abuse was "inappropriate" and "shouldn't be done," which [Child] then echoed several times at the Fair Hearing by calling [Father's] behavior "inappropriate." As a result of these circumstances, the hearing record demonstrates a clear pattern of other people around [Child] either telling her that she was right to speak about the allegations, that [Father] was bad, that [Child should] continue to say the allegations, and [Child's] own testimony became more affirmative as time passed in this case.

*As a result of relying only on the testimony of [Child] the testimony must be so credible, that the facts to which [Child] has testified are remembered distinctly, and that the testimony* is so clear and convincing as to enable either a judge or jury to *come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. See Suber* at 682. [*Suber v. Pennsylvania Commission on Crime and Delinquency*, 885 A.2d 678, 682 (Pa. Cmwlth. 2005)] *However, examining the testimony, the testimony is not remembered so distinctly or so clear and convincing that the undersigned can come to a clear conviction.* In this case, the testimony and the circumstances surrounding the testimony demonstrate a strong likelihood of testimony that was tainted and influenced to some degree by the actions and comments of other people around [Child].

As a result, [Child's] testimony is not credible on the basis that it appears tainted and influenced to some extent by the comments of other persons and very possibly initiated by her own mother. Therefore, it cannot be found credible. [Mother's] testimony is also not credible on the basis that she has made false allegations in the past against [Father], and it is clear that she was involved to some extent in [Child's] testimony despite her testimony to the contrary.

Furthermore, [Father] testified in a very straightforward and clear manner. He candidly admitted to having pornography on his phone and also that he had bathed [Child] and touched her vagina once with cream to heal a rash. He was forthright with the CYS investigators at all times, and his testimony was not contradicted in any way.

*Therefore, in this case, CYS has not presented clear and convincing evidence of sexual abuse occurring in this case.* In accordance with the foregoing, [Father's] appeal should be sustained. A recommendation will be made to the Regional Manager consistent with these findings and conclusions.

Recommended Adjudication at 11-12 (emphasis added).

As this discussion shows, ALJ Bobeck's decision to reject Child's testimony was based, at least in part, upon the demands of the clear and convincing standard of proof. To meet this standard, testimony must be so clear and distinct

28

that the factfinder can "come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." Recommended Adjudication at 12. ALJ Bobeck concluded that Child's testimony did not meet this standard.

In *G.V. II*, 91 A.3d 667, our Supreme Court reversed this Court's holding that an indicated report of child abuse must be proved under the clear and convincing standard of proof. It held, instead, that Section 6303(a) of the Child Protective Services Law, 23 Pa. C.S. §6303(a), governs the standard of proof in expunction hearings. In his concurring opinion, Justice Baer explained that the statutory standard is the "well-known civil standard of preponderance of the evidence." *Id.* at 679 (Baer, J., concurring). In a second concurring opinion, now Chief Justice Saylor agreed with Justice Baer on this point and cautioned against conflating the statutory standard at 23 Pa. C.S. §6303(a) with the "substantial evidence standard prevailing on appellate review under Section 704 of the Administrative Agency Law, 2 Pa. C.S. §704." *Id.* at 674 (Saylor, J., concurring). He explained the material difference. The statutory standard incorporates a "weighing dynamic." *Id.* By contrast, "[t]raditional appellate substantial-evidence review ... omits all such weighing – instead, this deferential form of review entails only an examination of whether the evidence, viewed in a light most favorable to the prevailing party, is adequate to support the administrative agency's factual findings." *Id.*

In sum, the standard of proof is preponderance of the evidence, and the standard for substantial evidence presented in an expunction hearing is

> [e]vidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion.

23 Pa. C.S. §6303(a). Whether evidence meets a prescribed standard of proof is "always a question of law and therefore reviewable by the appellate court." *Stafford v. Reed*, 70 A.2d 345, 346 (Pa. 1950).

ALJ Bobeck invoked the clear and convincing standard of proof in making his determination that Child was not credible. This was correct at the time, but it is no longer. Accordingly, we must remand for an evaluation of the record evidence using the correct standard of proof and the statutory standard for substantial evidence, which is "[e]vidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion." 23 Pa. C.S. §6303(a). Application of this standard involves a "weighing dynamic." *G.V. II*, 91 A.3d at 674.

ALJ Bobeck's second reason for rejecting Child's testimony was that "it appears tainted and influenced to some extent by the comments of other persons and very possibly initiated by her own mother." Recommended Adjudication at 12. The Department argues that the ALJ's credibility determinations are dispositive under any standard of proof. *See Delbridge*, 855 A.2d at 39 (explaining that where "some evidence" of "suggestive questioning, vilification of the accused and interviewer bias may have influenced a child witness" it constitutes taint).[12] A child's testimony that is tainted, the Department argues, cannot be credited.[13]

---

[12] ALJ Bobeck found that the questions Kristen Fetcho put to Child were not leading. However, at the end of the interview, Fetcho told Child "that her dad was bad" and that Child needed to "tell other people about the bad things that [Father] did." Recommended Adjudication at 11.

[13] Both Child and Mother testified that Mother asked Child about inappropriate videos and then moved on to the question of whether Child had been inappropriately touched by Father. Dr. Esteve also testified that Mother volunteered that her first question of Child was whether "[Child was] inappropriately touched by [Father]." N.T. 5/13/13 at 31.

**(Footnote continued on the next page . . .)**

30

CYS does not argue that tainted testimony can be credited. Rather, it argues that ALJ Bobeck erred because his finding of taint did not consider the factors identified by Dr. Esteve. He explained that a child who has suffered trauma will be reluctant to discuss the trauma. CYS believes Child's reluctance to describe the "inappropriate stuff" at the hearing demonstrates that her testimony was *not* influenced by others but, rather, was the result of trauma. CYS argues that "if Dr. Esteve's testimony had been considered, the appeal of [Father] would have been denied." CYS Brief at 21.

An ALJ is not required to address all the evidence that is presented. *A.P. v. Department of Public Welfare*, 98 A.3d 736, 744 (Pa. Cmwlth. 2014); *Pistella v. Workmen's Compensation Appeal Board (Samson Buick Body Shop)*, 633 A.2d 230, 234 (Pa. Cmwlth. 1993) (factfinder must "make crucial findings of fact on all essential issues necessary for [appellate] review … but is not required to address specifically each bit of evidence offered"). It was not error for ALJ Bobeck to omit the substance of Dr. Esteve's testimony when evaluating Child's credibility.

---

**(continued . . .)**

In his custody report, Dr. Esteve noted that Mother described her questions of child as follows: "Did you ever see on [Father's] phone, movies?" "Were the people naked?" "Did [Father] ever touch you in your private areas?" "Did you ever touch [Father]." Certified Record, Item No. 3, Exhibit A-2, at 5. None of these questions were "open-ended" but, rather, sought confirmation. Child responded "yes" to each one. *Id.*

In addition to Father, Mother named three other persons, including Child's biological father, as pedophiles. The custody report noted that Mother accused Father of abusing Brother during a supervised visit. Certified Record, Item No. 3, Exhibit A-2, at 9. CYS did not issue an indicated report on this claim. *Id.* at 45.

31

However, because we are remanding this case, the factfinder may consider Dr. Esteve's testimony. This testimony could support a conclusion that Child's hesitancy and lack of specificity at the hearing indicated trauma. On the other hand, Dr. Esteve's testimony could also support the conclusion that Mother tainted Child's testimony. Dr. Esteve testified that Mother volunteered that her questions of Child were leading, and she was the first to question Child. Dr. Esteve also questioned the reliability of the forensic interview, noting that had Child been abused by Father, it is unlikely she would have revealed this information early in her first encounter with Fetcho, a stranger.[14]

In short, upon remand, the factfinder may consider Dr. Esteve's testimony. However, if the factfinder chooses to do so, he must consider all of Dr. Esteve's testimony, not just that testimony CYS has cited.[15]

## Conclusion

We reject the conclusory argument by CYS that Child's testimony proved abuse because it overlooks the fact that the ALJ did not find that testimony credible. Likewise, we reject CYS' contention that an ALJ may not make credibility determinations on a cold record. Finally, we reject CYS' argument that

---

[14] Dr. Esteve also addressed the correlates of a pedophile and why he did not believe Father was a pedophile.

[15] CYS challenges ALJ Bobeck's finding that Father and Mother "underwent a long, contentious custody dispute[.]" Recommended Adjudication at 6, Finding of Fact No. 25. CYS' one-paragraph argument asserts that the custody dispute was not an item in dispute in the Fair Hearing and by noting this item, the outcome of the case was prejudicial. CYS does not challenge the fact itself. Mother and Father were engaged in a long, contentious custody dispute over Brother's custody, not Child's custody. CYS fails to explain how this finding of fact prejudicially influenced the outcome of the case and, accordingly, we reject this claim of error.

32

the ALJ's reference to the custody dispute between Mother and Father was somehow prejudicial.

To be consistent with *G.V. II*, we remand this matter for a new decision that applies the correct standard of proof to the evidence, including credibility determinations. In doing so, the factfinder may consider all the evidence, including the testimony of Dr. Esteve.

_____
MARY HANNAH LEAVITT, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Carbon County Children and Youth
Services,
     Petitioner

   v.

Department of Public Welfare,
     Respondent

: 
:
:
: **CASE SEALED**
: No. 533 C.D. 2014
:
:
:

# **O R D E R**

AND NOW, this 19th day of October, 2015, the order of the Department of Public Welfare, dated March 4, 2014, is hereby VACATED and the matter is REMANDED in accordance with the attached opinion.

  Jurisdiction relinquished.

            _____
            MARY HANNAH LEAVITT, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Carbon County Children             :
and Youth Services,                :
          Petitioner         :
                                 :
          v.                 :
                                 :  **CASE SEALED**
Department of Public Welfare,      :  533 C.D. 2014
          Respondent         :  Submitted: September 26, 2014

BEFORE:   HONORABLE BERNARD L. McGINLEY, Judge
               HONORABLE MARY HANNAH LEAVITT, Judge
               HONORABLE P. KEVIN BROBSON, Judge

OPINION NOT REPORTED

CONCURRING AND DISSENTING
OPINION BY JUDGE McGINLEY        FILED:  October 19, 2015

I agree with the Majority's ultimate conclusion that this matter must be remanded for application of the correct standard espoused in <u>G.V. II</u>. However, that is the sole extent to which I join.

The crux of this appeal is ALJ Bobeck's[1] rejection of the credibility of Child and Mother based on his review of a "cold record." ALJ Bobeck concluded that Child's testimony was "tainted" by the forensic interviewer, Ms. Fetcho, and by Mother, whom he found invented the allegations in order to secure custody of her other child. He also found Child not credible for various reasons.

---

[1] I am aware that the Bureau of Hearings and Appeals functions as the finder of fact in expungement hearings. <u>R.</u>, 636 A.2d at 145. However, because the Bureau adopted ALJ Bobeck's recommendation in its entirety without discussion, I refer directly to ALJ Bobeck's findings and explanations.

Clearly, our appellate function requires us to conduct a *meaningful* review of ALJ Bobeck's rationale for his conclusions, his explanations and logic, and to make certain that findings were supported by substantial evidence. Substantial evidence *does not* consist of misconstrued or mistaken testimony. While the Majority is content to remand for application of the "preponderance of the evidence" standard, I, on the other hand, do not agree that this Court is required to sit by while a factual finding in support of a credibility determination lacks any basis in the record. The Majority does not hold ALJ Bobeck and the Bureau to the appropriate standard and fails to ensure that the credibility and factual analysis was properly conducted.

Whenever a fact finder has not observed the witness testify and cannot assess witness demeanor, the reasons for rejecting a witness's credibility *must* be supported by the record; otherwise, this Court may reject them. Spencer v. City of Reading Charter Bd., 97 A.3d 834 (Pa. Cmwlth. 2014); Agostino v. Township of Collier, 968 A.2d 258, 263–264 (Pa. Cmwlth. 2009); Casne v. Workers' Compensation Appeal Board (Stat Couriers, Inc.), 962 A.2d 14, 19 (Pa. Cmwlth. 2008). Here, even a *cursory* review of the record reveals that ALJ Bobeck's findings of fact lack cogent support. There must be new credibility determinations and new findings of fact; findings that are based on a thorough and accurate reading of the record.

BLM-2

Further, I believe that this Court is able to determine that the record was insufficient to establish as a matter of law that Child's testimony was tainted or that Child was incompetent to testify. Thus, I disagree with the Majority that it is necessary for the fact-finder to revisit the issue of "taint" on remand.

### I. Taint by Ms. Fetcho

One of the key reasons ALJ Bobeck "disbelieved" Child's testimony was because "it appear[ed] tainted and influenced to some degree by the actions and comments of other persons and very possibly initiated by her own mother. Therefore it cannot be found credible." Recommended Adjudication, at 12.

"Taint" is defined as "the implantation of false memories or the distortion of real memories caused by interview techniques of law enforcement, social service personnel, and other interested adults, that are so unduly suggestive and coercive as to infect the memory of the child ...." Commonwealth v. Delbridge, 855 A.2d 27, 40 (Pa. 2003). "[T]aint is a matter properly examined during a competency determination as it goes to the question of whether the child has the memory capacity to retain an independent recollection of the occurrence." Delbridge, 855 A.2d at 34.

In Delbridge, the Supreme Court explained:

In order to trigger an investigation of competency
on the issue of taint, the moving party must show
some evidence of taint. Once some evidence of

BLM-3

taint is presented, the competency hearing must be expanded to explore this specific question. During the hearing the party alleging taint bears the burden of production of evidence of taint and the burden of persuasion to show taint by clear and convincing evidence. Pennsylvania has always maintained that since competency is the presumption, the moving party must carry the burden of overcoming that presumption…. [A]s with all questions of competency, the resolution of a taint challenge to the competency of a child witness is a matter addressed to the discretion of the trial court.

Id. at 40–41 (internal citations omitted).

"An allegation that the witness's memory of the event has been tainted raises a red flag regarding competency, not credibility." Delbridge, 855 A.2d at 43.

Here, ALJ Bobeck concluded that the alleged "taint" affected Child's "credibility" when actually, it went to her "competency."[2] Notwithstanding this error, even if ALJ Bobeck had addressed taint as an issue of competency as opposed to credibility, I do not believe that J.K. met his burden of showing *evidence of taint* as required by Delbridge. ALJ

---

[2] When a moving party presents some evidence of taint in a criminal proceeding involving child sexual abuse, the trial court must conduct a "competency hearing." Delbridge. In this expungement proceeding, at the commencement of the hearing, ALJ Nause questioned Child *in camera* and initially determined Child to be competent based on her ability to decipher between truth and a lie, to recall the incident and articulate what happened. ALJ Nause did not explore the issue of the Child's taint during her initial *in camera* examination of Child. However, at the request of J.K.'s counsel, ALJ Nause allowed J.K.'s counsel the opportunity to prove during the hearing that the Child was incompetent due to taint.

Bobeck's conclusion that Child's testimony was tainted was not supported by the record.

ALJ Bobeck concluded that Child's testimony was tainted because Ms. Fetcho's "affirmations" improperly encouraged Child to be more ardent or more certain as time passed.

Putting aside the ***manner of*** the supposed taint, the basic underlying rationale for ALJ Bobeck's finding Child's testimony was tainted was in error. The "result" of an alleged "taint" did not happen as articulated by ALJ Bobeck. Regardless of ***how*** a taint may come about, there first must be some sign or indication that there ***was*** a taint in order to make the former analysis relevant. CYS argues that Child's testimony was consistent and that Child recalled the specifics in detail, including when, where and how often it happened, who was present, how J.K.'s body and the Child's body were positioned, her belief that J.K.'s nose was inside her because "she always saw his chin." In summary, there was no sign or "red flag" that Child's testimony was influenced in any way, that she was merely repeating what someone else said to her, or that her recollections were not her own. According to ALJ Bobeck, however, "**Ms. Fetcho's affirmations become important because at the time of the Fair Hearing which took place almost two years later in March 2013, M.K. [Child] testified definitively that Appellant [J.K.] licked her**." Recommended Adjudication, at 11. (Emphasis added.)

Contrary to ALJ Bobeck's finding, Child's testimony at the forensic interview and expungement hearing were entirely consistent. First, Child did not testify definitely at the expungement that J.K. licked her. Rather, the person who testified at the expungement hearing that J.K. "licked" Child was Ms. Fetcho. Child's testimony at the expungement hearing was actually less specific than what she described at her forensic interview (she stated a number of times at the expungement hearing that she did not want to explain it and that it was "hard" for her to explain). Consistent with her forensic interview, Child testified at the expungement hearing that J.K. asked her to do "inappropriate" things with her "pee-pee." J.K told her to take her clothes off and she did. J.K. told her to lick "by his private parts" and she did. When asked if J.K. touched her anywhere, Child responded: "Yes…[i]n my private spot." H.T. 3/27/13 at 72; R.R. at 73a. Child testified at the expungement hearing that J.K. had her watch pornographic videos, which J.K., himself, testified the videos included oral sex. And, she said that J.K. "told me if I would do it, then he would let me play a game on the computer." H.T. 3/27/13 at 43; R.R. at 44a.

After viewing the forensic interview (DVD/Exhibit C-1), there is no evidence whatsoever to support ALJ Bobeck's conclusion that Child's testimony at either the forensic interview or at the expungement hearing was tainted or that she was coached or told what to say. Dr. Esteve explained: "Young children whose testimony will be tainted will use language that is not their own, language that, in essence, has been presented to them by other

individuals … when asked very specific points, they are more likely to have difficulty." N.T. 5/13/13 at 27.

Here, Child presented extremely detailed testimony at the forensic interview. She had no difficulty whatsoever answering specific questions. When describing the events, she used language appropriate for a seven year old. She was shy and soft spoken. She was focused. She actually corrected Ms. Fetcho at one point. Child was consistent. Her answers to questions were spontaneous and appropriate.

Child understood that she was at the forensic interview "to talk about what happened with daddy." Child stated it "happened more than one time" and that it "happened in the same place" which was the "attic" and that "it wasn't the computer room when he and I were doing it." When asked what happened in the attic, Child stated "we would do the little thing" and that "it was always the same thing." When asked to describe what the "little thing" was, Child stated "my dad tells me to do what he likes and stuff." When asked what kind of stuff, Child stated "he makes me lick his pee-pee." When asked what her daddy's pee-pee looked like, Child stated that it was "the same as [Brother's]." When asked if there were any differences between Brother's and J.K.'s penises, Child said "there was only one thing – it was hairier [sic]." When asked if it was pointing down or up, Child stated it was "pointing up." When asked what J.K. would ask her to do, Child stated "he made me lick it and play with it by pulling it and stuff." Child stated that J.K. asked her to touch "the round part of it" and

demonstrated with a hand motion how she rubbed it. When asked if her daddy did anything to her, Child stated "he was doing something to me but by accident he hurted [sic] me" and "he told me to turn around. I thought he was licking it and accidently his nose slipped into the middle of it. I thought that because I always saw his chin." She was on her "belly" when this happened. When asked what "daddy" was wearing Child indicated nothing. "We both took off our clothes." When Ms. Fetcho began a question with: "when daddy was licking you…" Child interrupted and stated: "I *thought* he did but he was really rubbing his nose." When asked if daddy ever showed her pictures, or movies or anything Child stated that her daddy showed her videos on his phone of "big people" licking each other's "pee-pees." J.K. took Child into the attic on a bed and had her touch and "lick his penis." Child stated that when these incidents occurred, Child and J.K. were both naked. Sometimes her two-year old brother [Brother] was in the room playing with toys. She also stated that daddy told her not to tell because "he would be in trouble, and he is." DVD, Exhibit "C-1."

As CYS argues, not one of the indicators set forth by Dr. Esteve was present. ALJ Bobeck pointed to nothing in Child's forensic interview that would support a conclusion that Child's testimony did not reflect her own independent recollection of events. His conclusion that Child's testimony at the expungement hearing was tainted was clearly based on his misperception that Child's testimony changed from the forensic interview to the expungement hearing.

Turning briefly to the **manner of** the alleged taint caused by Ms. Fetcho's statements at the forensic interview, ALJ Bobeck found that at the end of the interview Ms. Fetcho told the Child that "her dad was bad." Recommended Adjudication at 11.

Commonwealth v. Davis, 939 A.2d 905, 911 (Pa. Super. 2007), provides an example of a child's "tainted" testimony and a police interview that was "pointed," "leading" and "suggestive."  There, Mark Davis was charged with offenses arising from the alleged sexual contact with his son, J.D., who was nine years old.  The Commonwealth alleged that one morning while Davis was lying in bed reading the Bible with J.D., he read the word "circumcision" and asked J.D. if he knew what that meant.  Davis explained circumcision, at which point, the Commonwealth alleged, Davis exposed himself and had inappropriate physical contact with J.D.  J.D. reportedly told his mother about the incident and she contacted police.  Davis, 939 A.2d at 906.  The police interview was conducted by a detective.  Before any questions were posed, the detective began the interview with: "All right.  Relax, little guy.  I know this is tough.  I know dad has done some things that weren't appropriate and that's what we're going to talk to you about.  Okay?" Davis, 939 A.2d at 908 (Emphasis in original.)  The detective asked J.D. generally to describe things that his father had done that he "didn't think was [sic] right."  Id. at 911.  J.D. responded but did not refer to any sexual incidents.  The detective then attempted to focus J.D.'s attention to the "circumcision incident."

BLM-9

Q.    I want you to tell us about a time where you're in bed and your dad's reading you a story from the Bible.

A.    Mostly in the morning.

Q.    Did anything strange happen to you while he was reading the Bible to you while you guys were in bed?

A.    Nothing I remember.

Q.    Was there ever a time your dad was reading you a story in the Bible that had to do with circumcision?

A.    Yes.

Q.    What happened then?

A.    (Inaudible).    And he was showing his, touching and feeling and then he said to me like you do it, but I was like really scared, no to, right then, so then he did it for me and tried telling me to do it.

Q.    When he pulled down his pants, what was he doing to his penis?

A.    He was touching it and telling me where it is and stuff.

Davis, 939 A.2d at 908-909.


The detective then went on to ask J.D. a number of leading questions about his father's anatomy and "introduced a sexual vocabulary previously absent from J.D.'s account." Davis, 939 A.2d at 911. Before the interview was concluded, the detective made some "derogatory remarks" about Davis indicating to J.D. that his dad was "done," not to "worry about

BLM-10

dad being mad" and that his dad "should be mad because he did something wrong." Davis, 939 A.2d at 909-910.

The case was held for court and Davis requested a competency hearing. At the competency hearing, J.D.'s unprompted recollection of the event was "extremely limited." He did not remember the "circumcision incident." The trial court found that when J.D. testified after the Commonwealth "refreshed" J.D.'s memory with the transcript of the police interview, J.D.'s testimony was "nothing more than a regurgitation of the words, descriptions and concepts that had been suggested to him by the detective, not an independent recollection of the events themselves." Davis, 939 A.2d at 911. The trial court found that J.D.'s testimony was tainted and excluded it. The Superior Court concluded that the trial court did not abuse its discretion in finding that J.D.'s testimony was tainted and that he lacked the capacity to testify.

Here, unlike in Davis, Child never indicated at the expungement hearing that she did not remember the incident. There was no indication that she was merely regurgitating something Ms. Fetcho or Mother told her. There was no need to use the transcript of Child's forensic interview to refresh her memory at the expungement hearing. Child's substantive account of events was consistent with what she relayed in her forensic interview.

Furthermore, a review of the forensic interview (DVD/Exhibit C-1) reveals that, contrary to ALJ Bobeck's finding, Ms. Fetcho did ***not*** say "her dad was bad" or anything else remotely improper or inappropriate. She asked opened-ended questions. Not one question was leading.[3] She did not criticize or disparage J.K. Child's statements were unprompted and voluntary. Furthermore, the subject "affirmations" that ALJ Bobeck talks about were made ***after*** the Child independently and lucidly articulated the sexual abuse in order to reassure the Child, who was seven years old at the time, that she had done nothing wrong. When asked if the Child loved her "daddy" the Child stated that she did. Ms. Fetcho told Child that "do you know that you did nothing wrong" and "you're not in trouble" and "you're a hero because you are going to help us stop daddy from doing that to you, or anyone else, anymore." DVD, Exhibit C-1. Ms. Fetcho took a moment to reassure the Child that she did nothing wrong, praised her for being brave and told her she was a hero and that it was important for her to continue to be cooperative.

## II. Taint By Mother

Despite Child's unprompted and independent recollection of the events and ALJ Nauhaus' conclusion that Child was competent to testify,[4]

---

[3] The Majority actually perpetuates the error because it categorically accepts this as fact in footnote 12, and advocates that the question was "leading." Both ALJ Bobeck and the Majority are wrong because Ms. Fetcho never stated to Child that "her dad was bad."

[4] Compare Commonwealth v. Davis, 939 A.2d 905, 911 (Pa. Super. 2007) (minor's testimony regarding alleged sexual abuse was nothing more than a regurgitation of the words, descriptions and concepts that had been suggested to him by the detective, not an independent recollection of the events themselves.)

BLM-12

the Majority encourages the fact finder on remand to consider *all* of Dr. Esteve's testimony because it "could" support that Mother tainted Child's testimony. Specifically, the Majority cites to portions of Dr. Esteve's "custody report" in a completely unrelated proceeding, in which he describes in his own words Mother's account of how she learned of the alleged sexual abuse. However, Dr. Esteve did not observe the Child testify either at the forensic interview or the expungement hearing and could offer no opinion as to whether the Child was "competent" to testify or whether Child's testimony appeared to be tainted in the first place. He did not watch Ms. Fetcho's interview and did not opine that her interview techniques were "unduly suggestive or coercive as to infect the memory of the child." Davis, 939 A.2d at 911.

Even when considering all of Dr. Esteve's testimony on the issue of the supposed *manner* of the taint, it has no bearing on the threshold issue of whether Child's testimony bore the tell-tale signs of taint. In fact, as CYS points out, most of his opinions actually belie the conclusion that Child's testimony was tainted. The only opinion of Dr. Esteve that could remotely support the conclusion that Child's testimony was tainted was his opinion that children who have been tainted "will use language that's not their own." ALJ Bobeck concluded that Child's use of the word "inappropriate" established that her testimony was tainted because she was just "echoing" what her Mother told her. However, when Child's testimony is read in context, it is clear that she knew exactly what the word "inappropriate" meant and she put it into her own words:

BLM-13

Q. What did you tell your mom?

A. Everything that happened.

Q. And what do you mean, 'Everything that happened'? What happened?

A. The inappropriate stuff.

Q. How did you know it was inappropriate?

A. My mom told it to me. Like, it's inappropriate for him to do that.

THE COURT: It's inappropriate for?

A. **For, like, that to happen**.

THE COURT: 'For that to happen'

A. **He shouldn't be doing it**.

H.T. 3/27/13 at 46-47; R.R. at 47a-48a (emphasis added).

Further, contrary to the Majority's belief, Dr. Esteve's testimony is not at all probative of Mother's motivations for fabricating the allegations.

In Finding of Fact No. 25, ALJ Bobeck found that "[d]uring the course of this case over the past two years from 2011 to 2013, Appellant [J.K.] and D.K. [Mother] underwent a long, contentious custody dispute over the children." Recommended Adjudication, F.O.F. No. 25 at 11. He found Mother was motivated to fabricate the allegations because there was "a very contentious and protracted custody battle between the Appellant [J.K.] and D.K. [Mother] continued (over Brother)." Adjudicated Recommendation at

BLM-14

11. However, these findings, even if true, do not explain Mother's motive to manufacture allegations of the sexual abuse of her Child. The child custody proceedings were initiated *after* Mother learned of the alleged sexual abuse, and by all accounts, the custody proceedings were actually initiated *because of* the abuse allegations. Further, J.K. did not present evidence to explain why Mother would have her Child fabricate such serious, criminal allegations. J.K. briefly mentioned that he had declined to give Mother $10,000 for one of her family members. He also mentioned his personal belief that Mother suffered from "Contemporary Munchausen Syndrome." H.T. 5/13/13 at 92; R.R. at 221a.[5]

However, neither explanation was developed. Instead, J.K. spent much time explaining what Mother did ***after*** Child made the allegations. She called the police, she called CYS, she "kicked him out" of the house, and she filed for custody. He described her as "militant." H.T. 5/13/13 at 93; R.R. at 222a. She texted him: "I will destroy you. You do not know what a mom like me is capable of. God will punish you, and so will I." N.T. 5/13/13 at 97; R.R. at 226a. None of this should have swayed the ALJ regarding Mother's alleged motive because these events took place ***after*** Child's allegations. The custody proceeding was initiated ***after*** the allegations of abuse came to light. Again, Mother initiated the so-called "custody battle" ***because of*** the allegations.

---

[5] Contemporary Munchausen Syndrome refers to the abuse of another person, typically a child, in order to seek attention or sympathy for the abuser.

BLM-15

Also, ALJ Bobeck's finding that Ms. Geissinger was *credible* actually contradicts his findings about Mother's motive to fabricate the allegations. Ms. Geissinger was asked to describe her observations of Mother. Ms. Geissinger testified:

> Well, certainly her – her statements were always consistent. In the beginning – in the month of April, she would say, '**I just don't believe he's capable of this. I don't think' – 'I mean I left him alone with the kids. I don't think I should have worried about that. He's a minister. He does all these good things for others, like' – 'like I don't think that, you know, he did this,' in the beginning**.
>
> And she was consistent with that throughout the month of April. **And when May came around and we had both the results from the lie detectors is when D. [Mother] started pushing harder as far as, you know, making sure M [Child] had help, that she was going to court, and she was going to fight custody. And she really pushed it and pushed me after that point.**
>
> So, I don't – I mean, when you're saying how she acted towards me, in the beginning, it was you know: What do I do? Like, **I don't know what to do with this victim of abuse. Help me. Point me in the right direction. You know, should I talk to him? Should I allow him visitation?**
>
> **She was asking me a lot of questions that seemed to be like a normal grieving mother that didn't know where to go**.

H.T. 5/13/13 at 151-152; R.R. at 281a-282a. (Emphasis of both underline and bold added.)

BLM-16

While ALJ Bobeck credited Ms. Geissinger's testimony, he failed to acknowledge that it directly contradicted his finding that Mother "used" Child to fabricate the sexual abuse allegations.

### III. ALJ Bobecks Rejection of Child's Credibility

According to the Majority, under <u>McElwee v. Southwestern Pennsylvania Transportation Authority</u>, 948 A.2d 762 (Pa. 2008), ALJ Bobeck "only had to explain his credibility determinations by identifying his reasons for accepting or rejecting a particular witness's testimony." Slip Opinion at 26. The Majority further notes ALJ Bobeck "explained his credibility determinations "in some detail." Slip Opinion at 26. I respectfully disagree.

A thorough review of the record reveals that most of ALJ Bobeck's findings of fact which led to his rejection of Child's credibility were based on a misreading of the record, a misapplication of law, and flawed logic. Where, as here, the fact finder has not observed the witness testify and is unable to assess witness demeanor, the fact finder must identify *supportable* grounds upon which it discounted testimony. <u>McElwee</u>. (Emphasis added.) Applying this standard, I believe the other reasons ALJ Bobeck gave for rejecting the Child's credibility were not supported by the record.

Specifically, ALJ Bobeck disregarded Child's testimony because she was unable to recall the year, date, season or general weather

BLM-17

conditions around the time of the alleged abuse. Recommended Adjudication, F.O.F. No. 20 at 11. In these circumstances, the rejection of a seven-year old child's testimony on the grounds that she could not recall the year, date, season or weather conditions should not have been determinative; especially, in light of the fact that Child did provide other relevant testimony that corroborated her ability to recall specifics about the events that should have been, but were not, considered by ALJ Bobeck. Specifically, Child recalled that the abuse took place in the house in Jim Thorpe where she previously resided, as opposed to the house in which she then resided in Clarks Summit. H.T. 3/27/13 at 42; R.R. at 43a. Child also recalled that the alleged abuse took place in the "attic" of the house in Jim Thorpe. The attic was used at different times; first, as a bedroom which contained a bed, and later as an office. Child described events which happened when the bed was there and afterwards "when the bed was gone." H.T. 3/27/13 at 72-73; R.R. at 73a-74a.

ALJ Bobeck also misconstrued several material facts which reflects that he did not carefully review the record which is essential when making credibility determination on a cold record. For example, ALJ Bobeck found Child not credible because she was unable to describe J.K.'s penis. However, as noted, Child *did* describe J.K.'s penis during her forensic interview noting that it was different from her private area and describing how physically it was different from her baby brother's penis.[6]

---

[6] Remarkably, ALJ Bobeck credited J.K. because J.K. "testified in a very straightforward and clear manner." Recommended Adjudication at 12. Without being asked about how the Child's hymen may have been damaged, J.K. volunteered an

incident where Child "may have been confused" when he, having been trained "in chemicals" and "biological warfare," was putting Desitin on Child "for a urinary tract infection."

I had Cream on my finger, and it dropped. It fell off. My hands were full. J2's [Brother] was watching T.V. behind us. It fell off my finger. And when it fell off, it hit the inside of her – I guess it's called 'labia.' I miss – inappropriately said 'vagina' and a nurse practitioner corrected me.

But it fell on her labia, and then, it hit, I guess what's called her hymen, and she screamed.

I thought that – the first thing that came to me was chemical burn. I freaked out. So, I bent down. I tried to scoop it out, to get it out of – off of her – she's small, you know – from out of her. It didn't work. I went and I got water. I tried to pour water on. I tried wiping it off, because I thought that she was crying because of the burning sensation.

What I learned months later was that it was pressure on the – hymen. That the child's hymen is very sensitive, and I didn't know that. I wasn't aware of that.

So in the process, I was obviously bending down. My nose was down. I did have my finger enter her – not for sexual reasons – on the inside trying to clean her to get the cream out before it burned her. And I'm -- I was freaking out. So, she did see me going – moving down towards her genital area.

And, again her testimony is my nose went into her. Well, it was my finger as I was trying to get the cream out. It was that – now, as far as she – she looks down and sees this person and sees a nose and feels the pain. She's going to make an assumption. But that was me trying to do personal hygiene.

****

I had to use my finger, and I touched her – I guess it's her hymen. I don't know if that's considered inside or outside of her vagina. I'm not a medical doctor. I did have to clean this cream – Desitin, I believe it was – from the inside, it was on the inside of her left labia. I can even picture it – her right.

H.T. 5/13/13 at 112-113, 128; R.R. at 242a-243a, 258a.

To credit this testimony requires too great a stretch.

BLM-19

He also misinterpreted Child's testimony with regard to how she came to view the pornography. In Finding of Fact No. 16, ALJ Bobeck stated: "M.K. [Child] and [7] *[Brother]* were occasionally together watching the pornographic videos together when J.1 [Brother] would borrow Appellant's [J.K.] phone and find the pornography. (N.T.1. 42-55[8])." Recommended Adjudication, F.O.F. No. 16 at 11. (Emphasis added.) This finding is not supported by the record and certainly not in the pages of the transcript cited by ALJ Bobeck. Child never testified that she occasionally watched pornography with her younger Brother. Rather, her five-year old Brother inadvertently accessed the pornography one time while trying to play "Handy Mandy" and that was when Mother heard the video playing and later asked Child if she had seen it. Child repeatedly and consistently testified that it was *J.K.* who showed her pornography on his phone and asked her to perform those acts upon him in exchange for permission to play a computer game.

---

ALJ Bobeck also found J.K. credible because he "candidly admitted to having pornography on his phone." However, I believe that in order to support that finding based on his review of a cold record, the ALJ was required to reconcile the blatant inconsistency between J.K.'s self-serving testimony that he had an aversion to oral sex and his admission that the majority of the pornographic videos he kept on his phone "to meet his needs" contained videos depicting oral sex.

[7] When a moving party presents some evidence of taint in a criminal proceeding involving child sexual abuse, the trial court must conduct a "competency hearing." Delbridge. In this expungement proceeding, at the commencement of the hearing, ALJ Nause questioned Child *in camera* and initially determined Child to be competent based on her ability to decipher between truth and a lie, to recall the incident and articulate what happened. ALJ Nause did not explore the issue of the Child's taint during her initial *in camera* examination of Child. However, at the request of J.K.'s counsel, ALJ Nause allowed J.K.'s counsel the opportunity to prove during the hearing that the Child was incompetent due to taint.

[8] Pages 42-55 contain Child's testimony.

The Majority is satisfied that ALJ Bobeck set forth the reasons for his credibility determinations "in some detail." However, the Majority does not address these obvious errors.

It is a rare occurrence indeed when a fact finder's credibility determinations must be reversed. But, this is one such instance.

## IV. Conclusion

The record is sufficient for this Court to make the threshold legal determination that Child was competent to testify. Delbridge. However, the reasons advanced for ALJ Bobeck's credibility determinations are unsupported by the record and must be vacated. His overall account of what transpired is seriously flawed. Because ALJ Bobeck's reasons for finding Child's testimony not credible are not supported by the record, I believe the Bureau's order must be vacated and remanded for the Bureau to: (1) make new findings of fact; (2) make new credibility findings and, after doing so; (3) issue a new order using the appropriate standard under G.V. II.

Accordingly, I would vacate the Bureau's order and remand the matter for a new determination as to whether DPW met its burden under G.V. II, to prove by a preponderance of the evidence that the indicated report of child abuse should be sustained and, consequently, whether expungement of the report from the ChildLine Registry is appropriate.

_____
BERNARD L. McGINLEY, Judge

BLM-21