**COMMONWEALTH of Pennsylvania, Appellant**

v.

**Mark DAVIS, Appellee.**

Superior Court of Pennsylvania.

Argued Aug. 29, 2007.

Filed Dec. 17, 2007.

Sheldon A. Kovach, Media, for Com., appellant.

Scott C. Shields, Media, for appellee.

BEFORE: KLEIN, BENDER and KELLY, JJ.

OPINION BY KELLY, J.

¶ 1 The Commonwealth of Pennsylvania appeals from an order entered in the Delaware County Court of Common Pleas barring the testimony of a minor witness found incompetent to testify after a taint hearing. We affirm.

¶ 2 Appellee Mark Davis was charged with offenses arising from allegations of criminal sexual contact with his two children. The instant appeal concerns only events related to one child during an event which is referred to throughout as "the circumcision incident." The Commonwealth alleges that while Mr. Davis was lying on a bed reading the Bible with his son, J.D., then 9 years old, he read the word "circumcision" and asked the boy if he knew what that word meant. Mr. Davis then began to explain circumcision, at which point the Commonwealth alleges he exposed and had inappropriate physical contact with his penis and his son's penis. J.D. allegedly reported the incident to his mother who contacted police. Police con-ducted interviews with J.D. on February 16th and March 4th; the criminal complaint filed on March 9, 2005 included allegations of indecent assault and indecent exposure related to the circumcision incident.

¶ 3 The case was held for court following a preliminary hearing, and Appellee moved for a competency hearing with regard to J.D. At the May 18th competency hearing, the trial court considered live testimony from J.D. as well as his testimony from the prior preliminary hearing, an evaluation letter from an examining physician, the tape recording of the first police interview, and a transcript of the second police interview. The trial court found the initial interview to consist of "a series of leading questions, and questions describing the circumstances, calculated to elicit affirmative or negative answers from the child rather than simply soliciting the child's narrative of the events." (Trial Ct. Op. at 4). In addition, the trial court noted than when J.D. was asked about the circumcision incident during the hearing he "indicated repeatedly that he didn't remember what happened." (Id. at 6).

¶ 4 The court concluded that based on limited memory and the taint effect produced by leading and suggestive questioning, J.D. lacked the minimal capacity required to testify at trial. The court entered an order to that effect on June 6, 2006, and a timely notice of appeal was filed by the Commonwealth. The sole issue before this Court is whether the trial court abused its discretion in finding clear and convincing evidence that J.D.'s testimony was tainted to the extent that he lacked the capacity to testify. We conclude that the trial court did not abuse its discretion, and affirm its order.

¶ 5 "The determination of a witness's competency rests within the sound

discretion of the trial court. The decision of the trial court will not be disturbed absent a clear abuse of that discretion; consequently ... our standard of review of rulings on the competency of witnesses is very limited indeed." *Commonwealth v. Judd,* 897 A.2d 1224, 1228 (Pa.Super.2006) (internal citations and quotations removed), *appeal denied,* 590 Pa. 675, 912 A.2d 1291 (Pa.2006).

> In Pennsylvania, the general rule is that every witness is presumed to be competent to be a witness. However, young children must be examined for competency pursuant to the following test: (1) The witness must be capable of expressing intelligent answers to questions; (2) The witness must have been capable of observing the event to be testified about and have the ability to remember it; and, (3) An awareness of the duty to tell the truth. An allegation of taint centers on the second element of the above test. Where an allegation of taint is made before trial the "appropriate venue" for investigation into such a claim is a competency hearing. A competency hearing is centered on the inquiry into the minimal capacity of the witness to communicate, to observe an event and accurately recall that observation, and to understand the necessity to speak the truth.

*Id.* (internal citations and quotations removed) (citing *Commonwealth v. Delbridge,* 578 Pa. 641, 855 A.2d 27, 39–40 (2003), *opinion after remand,* 580 Pa. 68, 859 A.2d 1254 (2004)).

¶ 6 In *Delbridge, supra,* our Supreme Court discussed the importance of determining whether an immature witness's testimony can be tainted by the inquiries of adults:

> The core belief underlying the theory of taint is that a child's memory is peculiarly susceptible to suggestibility so that when called to testify a child may have difficulty distinguishing fact from fantasy. Taint is the implantation of false memories or the distortion of real memories caused by interview techniques of law enforcement, social service personnel, and other interested adults, that are so unduly suggestive and coercive as to infect the memory of the child, rendering that child incompetent to testify.

*Id.* at 34–35 (internal citations omitted).

The Court also explained the effect of taint on the testimonial capacity of immature witnesses:

> The capacity of young children to testify has always been a concern as their immaturity can impact their ability to meet the minimal legal requirements of competency. Common experience informs us that children are, by their very essence, fanciful creatures who have difficulty distinguishing fantasy from reality; who when asked a question want to give the "right" answer, the answer that pleases the interrogator; who are subject to repeat ideas placed in their heads by others; and who have limited capacity for accurate memory.

*Id.* at 39 (internal citations omitted). After determining that a competency hearing was the proper forum for inquiry into the subject of taint, the Court discussed the burden of production necessary to trigger a hearing, and the burden of persuasion necessary to sustain the challenge:

> In order to trigger an investigation of competency on the issue of taint, the moving party must show some evidence of taint. Once some evidence of taint is presented, the competency hearing must be expanded to explore this specific question. During the hearing the party alleging taint bears the burden of production of evidence of taint and the burden of persuasion to show taint by clear and convincing evidence. Pennsylvania has always maintained that since compe-

tency is the presumption, the moving party must carry the burden of overcoming that presumption … [A]s with all questions of competency, the resolution of a taint challenge to the competency of a child witness is a matter addressed to the discretion of the trial court.

*Id.* at 40–41 (internal citations omitted).

¶ 7 The first police interview of J.D., and perhaps the most relevant for the purpose of determining whether his testimony was truly tainted, was conducted on February 16th by Detective Randolph McGoldrick. Although J.D.'s mother was initially present in the room, she left as the interrogation began. Before any questions regarding the circumcision incident were posed, Detective McGoldrick began the interview with: "All right. Relax, little guy. I know this is tough. **I know dad has done some things that weren't appropriate and that's what we're going to talk to you about.** Okay?" (Amended transcript—Oral Statement of J.D. on February 16, 2005, filed 6/28/07, at 3) (emphasis added).[1] During the interview, when asked general questions about anything his father had done that he "didn't think was right," J.D. did not refer to any sexual incidents. The Detective then attempted to focus J.D.'s attention on the circumcision incident, creating the portion of the interview that the trial court characterized as a "pointed" and "leading" interrogation:

Q: [J.D.], I want you to tell us about a time where you're in bed and you dad's reading you a story from the Bible.

A: Mostly in the morning.

Q: Did anything strange happen to you while he was reading the Bible to you while you guys were in bed?

A: Nothing I remember.

Q: Was there ever a time your dad was reading you a story in the Bible that had to do with circumcision?

A: Yes.

Q: What happened then?

A: (Inaudible). And he was showing his, touching and feeling and then he said to me like you do it, but I was like really scared, no to, right then, so then he did it for me and tried telling me to do it.

Q: When he pulled down his pants, what was he doing to his penis?

A: He was touching it and telling me where it is and stuff.

Q: Was he relating it to circumcision?

A: Yes.

Q: Do you know what a penis is?

A: Uh-huh.

\* \* \*

(*Id.* at 4–5). Shortly after this exchange, Detective McGoldrick asked J.D. a number of leading questions about what he observed:

Q: Do you know what an erection is?

A: Uh-uh.

Q: Do you know it is when a man's [penis] goes from small to large?

A: Uh-uh.

Q: No. Did your dad's [penis] look like your [penis]?

A: No.

Q: Did it look stiff?

A: Uh-huh.

---

1. This interview was presented in the May 18, 2006 competency hearing as an audio tape but the hearing transcript did not record the entire interview as it was played in court. The parties stipulated to and the court ordered the filing of an amended and complete transcript of the recording, effectively replacing pages 63–94 of the competency hearing transcript.

Q: So was it kind of like pointing straight up on its own?

A: Uh-huh.

Q: So were your, it wasn't dangling. It was like, in other words, stiff?

A: (Inaudible).

Q: Okay.

(*Id.* at 8–9). Detective McGoldrick then asked J.D. a number of questions about the manner in which his father explained circumcision, and about the contact between them:

Q: Did he comment or talk about his own [penis]?

A: Yes.

Q: What did he say?

A: He told me like, he said, well, when I was eight months old, this happened to me. When you were eight months old, this happened to you.

Q: Okay. Other than pointing to areas on his [penis], was he rubbing his [penis] at all?

A: Sometimes, like to show where it is.

Q: Show me how he would do that?

A: He was doing it here and feeling around.

Q: Okay. [J.D.], when asked, describes the form of the cupped hand and going up and down. Is that right? Is that what you just showed me?

A: No, sometimes he would do with it with the palm of his hand.

\* \* \*

Q: While your pants are down, is his [penis] still exposed?

A: Uh-huh.

Q: So then what does your dad do?

A: Then he starts pointing and he shows me, takes my hand and starts pointing. He's telling me stuff.

Q: And what is he saying?

A: He's saying that's where it happened and something.

Q: So he has, he takes your hand and puts it on your own [penis]?

A: Uh-huh.

\* \* \*

Q: What did he do to you?

A: He started feeling me and touching around.

Q: Was he doing it in that same motion that you had described earlier that he was doing to his [penis]?

A: This time he took his fingers and did it.

Q: Was he rubbing it up and down?

A: No.

\* \* \*

Q: Okay. Did he take your hand and put it on his [penis]?

A: No.

Q: No. Did he ask you to touch his [penis]?

A: Uh-uh.

(*Id.* at 9–12).

¶ 8 As the interview concluded, Detective McGoldrick asked J.D. if he was afraid of his father, to which J.D. responded that he was. The Detective then explained to J.D. that his father had done something wrong:

Q: Just so you know, [J.D.], you're growing up and you're growing up fast. With Mom, what Maria [CYS Caseworker] and I are doing, we're not doing it for your dad. We're doing this **because we think that your dad is done.** Okay. So if you put your hand in a fire, you get burnt. Was it the fire's fault? Or is it your fault for putting it in the fire?

A: My fault.

Q: Okay. Because the fire didn't do anything bad. The fire's doing its job.

Mom is trying to protect you guys because Dad has not been the same. Okay. And we're trying to protect you and Mom and [your sister]. So don't worry about your dad being mad. **Dad should be mad because he did something wrong, and we'll try to get to the bottom of it.** You didn't do anything wrong. Your mom didn't do anything wrong. [Your sister] didn't do anything wrong. And obviously, Maria [CYS caseworker] and I ... didn't do anything wrong.

(*Id.* at 16) (emphasis added).

¶ 9 At the taint hearing, J.D. was asked about his recollection of the circumcision incident. As the trial court noted, "the child's unprompted recollection of the event was extremely limited." (Trial Ct. Findings of Fact, at 5). A review of J.D.'s testimony supports this conclusion:

Q:  Did something happen right before [your father, Mr. Davis] moved out?

A:  Not that I can remember.

(Taint Hearing, 5/18/06, at 16).

¶ 10 The trial court took particular notice of the following exchange when J.D. was asked by counsel specifically about the circumcision incident:

Q:  So he showed you how he was circumcised?

A:  I think so.

Q:  Do you remember that?

A:  Not that much.

Q:  All right. Do you remember what, if anything, he did?

A:  No.

\* \* \*

Q:  All right. Do you recall pulling your own pants down to your knees to see how you were circumcised?

A:  I don't remember.

Q:  You don't remember any of that?

A:  No.

(Trial Ct. Op. at 5–6) (citing N.T. Hearing, at 32–33).

¶ 11 As a result, the trial court found that the facts and circumstances surrounding J.D.'s putative testimony was "on all fours" with the central thrust of *Delbridge, supra,* and warranted exclusion. We agree. *Delbridge* illuminated the various factors that cast doubt on the veracity of child witnesses interviewed by police, social service workers and other adults: they are highly suggestible, inclined to repeat that they have been told, have a limited capacity for accurate memory, and often answer questions in the way they believe most pleases the adult interrogator. When the present case is inspected in the instructive light of *Delbridge,* the same testimonial concerns that moved our Supreme Court are revealed here, manifest in the facts and evidence, and ineluctably presented. The problems with the testimony are twofold: first, J.D.'s independent recollection of the incident was extremely limited; and second, the suggestive technique and content of the interviews provided clear and convincing evidence that J.D.'s later recollections were tainted and a product of coercion, not of his own memory.

¶ 12 With regard to J.D.'s minimal recollection of the incident, we note that when he was first asked in the initial interview if anything strange had happened to him while in bed with his father his response was "nothing I remember." (Amended transcript—Oral Statement of J.D. on February 16, 2005, at 4). The trial court noted that during the hearing J.D. repeatedly stated that he did not remember the circumcision incident. The court relied on several questions and answers from that hearing, carefully recounted in its findings of fact, in determining that J.D. had virtually no memory of key events.

While this fact alone would call his putative testimony into serious doubt, the problems with that testimony were compounded when the Commonwealth attempted to "refresh" his exiguous recollection using prior testimony that was, as the trial court noted, "a product of the suggestive questions posed by the Detective." (Trial Ct. Op. at 8). Thus, the trial court found that J.D. had little actual memory of any relevant events, and what he did "remember" after being refreshed was nothing more than a regurgitation of the words, descriptions, and concepts that had been suggested to him by the Detective, not an independent recollection of the events themselves.

¶ 13 As to the issue of taint, *Delbridge* created a clear standard by which to determine whether a child's testimony has been distorted by the suggestive interviews of adults. The nature of the interviews conducted in this case illustrate the very phenomenon that *Delbridge* warns against, namely "the implantation of false memories or the distortion of real memories caused by interview techniques of law enforcement ... that are so unduly suggestive and coercive as to infect the memory of the child." *Delbridge, supra* at 34–35. Here, before J.D. was asked a single question about the incident in question, he was told that his father had done something that was not "appropriate." When asked to "tell us what your Dad did that wasn't right," J.D. referred to several irrelevant events, notably mentioning nothing about the circumcision incident. The trial court also took note of various derogatory remarks made by the detective about Mr. Davis to J.D., indicating that he was "done," and "should be mad because he did something wrong." *Id.* at 4–5.

¶ 14 When the child was unable to respond readily to the detective's questions, the detective re-asked them, suggesting answers and introducing a sexual vocabulary previously absent from J.D.'s account. J.D.'s first recorded recollections were evinced in the report written by a physician who examined him on February 4th, nearly two weeks prior to the initial interview by police.[2] As the trial court correctly noted, J.D. had previously described the "circumcision incident" only minimally and without any sexual innuendo:

> When I look at this report of the doctor ... about that particular incident when he first talks about [the circumcision incident], there is no sexual innuendo ... There's nothing about cupping and stiffness and erections. When Detective McGoldrick gets it, then ... I have quotes like, 'So you don't understand the process.' [Detective McGoldrick] introduces the word erection to him. [J.D.] never even heard the word erection. He doesn't even know what it means. [D]etective McGoldrick says, 'Does it go from small to large?' Now, he's leading him, putting words in his mouth. Stiff, he introduces the concept of stiff. 'Is it pointing straight?' [T]hese are concepts that were never entered before[, w]hen J.D. first talks to him, never discussed. It was all about him discussing a circumcision. It made me feel uncomfortable. I got up and away. But now it's small to large, it's stiff, it's pointing straight, not dangling. It's stiff. Was he rubbing? It's detective McGoldrick that introduces that. Stiff again. 'Was that the same motion, rubbing it up and down?' Now he's reinforcing words that he himself, Detective McGoldrick introduced ... And he concludes by saying that your dad has [sic] done so your dad is bad. And I don't think that this witness at this point can separate now

2. (Hearing, Exh. D–1).

what actually happened in that bed from an interview with [the examining doctor], what happened there, okay, versus what he testified at the preliminary hearing. Now to the point that he doesn't remember and clearly those words and those suggestions came out of Detective McGoldrick's mouth.

¶ 15 The Commonwealth relies on *Commonwealth v. Cesar*, 911 A.2d 978 (Pa.Super.2006), to distinguish the instant case from *Delbridge*. Its reliance is misplaced. In *Cesar*, we considered a taint hearing dealing with the testimony of a young sexual assault victim in which the trial court determined that the testimony was not tainted and the witness could testify. The appellant in that case argued that the witness had been "improperly coached by her mother, the assistant District Attorney, and the victim/witness coordinator." *Cesar, supra* at 985. As the witness began to testify, she indicated she was afraid and the court declared a brief recess during which the witness spoke with a victim-witness coordinator from the DA's office. *Id.* Upon returning to the stand, the witness testified about the nature of the sexual assault. When asked if she was telling her story because she remembered it or because she spoke with other people about it, the witness repeatedly indicated that she could remember the events in question independently, acknowledging that she had spoken to others about it but remembered it herself. *Id.* When asked if she would have been able to remember her story without meeting with the victim-witness coordinator she said that she would, and when specifically asked if her mother had helped her remember parts of her story that she had forgotten she said "No, I did it myself." *Id.*

¶ 16 Unlike *Cesar*, the present case involves taint which transcends mere improper refreshment of recollection; the taint begins at the initial interview with police. Further, the witness in *Cesar* never indicated she could not remember the events at issue; rather she stated quite the opposite, clearly and continually answering that she did in fact remember the critical events independently. Here, the witness insisted repeatedly that he did not remember the incident, and the trial court found that he merely recounted what he read in his already tainted testimony from the transcript of the preliminary hearing.

¶ 17 Accordingly, we find that the record amply supports the trial court's determination that J.D. was incompetent to testify; the record contains clear and convincing evidence that the testimony was tainted. As the trial court did not abuse its discretion, we affirm its order.

¶ 18 Order affirmed.