# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

J.K.,                       :
          Petitioner      :
                       :   **SEALED CASE**
     v.                :   No. 367 C.D. 2017
                       :   Argued: December 4, 2017
Department of Human Services,  :
          Respondent    :

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
              HONORABLE RENÉE COHN JUBELIRER, Judge
              HONORABLE J. WESLEY OLER, JR., Senior Judge

OPINION
BY PRESIDENT JUDGE LEAVITT             FILED: January 30, 2018

J.K. (Stepfather) petitions for review of the Secretary of Human Services' refusal to remove an indicated report from the ChildLine Registry[1] that named Stepfather as a perpetrator of child abuse. The Secretary affirmed the decision of the Administrative Law Judge (ALJ) who, on remand, reversed his prior determination that Stepfather had not abused his young stepdaughter, M.K. (Child). The Bureau of Hearings and Appeals of the Department of Human Services (Department)[2] adopted the ALJ's remand findings and conclusions of law as it did with respect to the ALJ's first determination. Stepfather argues that the ALJ erred by doing a *volte face* as factfinder on the identical evidentiary record and by finding

---

[1] ChildLine is a unit of the Department of Human Services that operates a statewide toll free system for receiving and maintaining reports of suspected child abuse, along with making referrals for investigation. 55 Pa. Code §3490.4. The ChildLine Registry is maintained in accordance with the Child Protective Services Law, 23 Pa. C.S. §§6301-6386.

[2] In November 2014, the Department of Public Welfare became the Department of Human Services. *See* Act of September 24, 2014, P.L. 2458, 62 P.S. §103 (effective November 24, 2014).

Child competent to testify after acknowledging that Child's testimony had been tainted. We agree and reverse.

## Background

On April 4, 2011, D.K. (Mother) reported to the Carbon County Office of Children and Youth Services (CYS) that Child, then seven years old, had been sexually abused by Stepfather.[3] On May 26, 2011, CYS issued an indicated report naming Stepfather as a perpetrator of child abuse, and Stepfather appealed to the Department. It appointed an ALJ to conduct an evidentiary hearing. After the hearing was concluded, the task of preparing the recommended adjudication was assigned to a second ALJ.[4]

At the hearing, which took place over two days in 2013, the ALJ first inquired into whether Child, who was nine years old, was competent to testify. Six months earlier, the court of common pleas had found Child incompetent to testify in Stepfather's criminal preliminary hearing because she could not remember what happened. Notes of Testimony (N.T.), 3/27/2013, at 34; Reproduced Record at 35a (R.R. ___). In response to the ALJ's questioning, Child stated that she was at the administrative hearing because Stepfather had done something "inappropriate." *Id.* at 33; R.R. 34a. When asked to explain what "inappropriate" meant, Child stated that "[h]e was, like, doing things, like, with a private spot." *Id.* at 34; R.R. 35a. Child could not state when this inappropriate conduct took place, how old she was or how many times it happened. Despite the ALJ's concerns about these gaps in

---

[3] A full summary of the case is set forth in *Carbon County Children and Youth Services v. Department of Public Welfare*, (Pa. Cmwlth., No. 533 C.D. 2014, filed October 19, 2015) (*County Appeal*).

[4] The Department appointed Barbara Shade Nause to conduct the evidentiary hearing. After the record closed, the Department appointed James Bobeck to prepare the recommended adjudication.

2

Child's memory, she found Child competent to testify, noting that Child had "some recollection of what occurred." *Id*. at 38; R.R. 39a.

Child then testified that Stepfather did "inappropriate things." N.T., 3/27/2013, at 42; R.R. 43a. She stated that Stepfather showed her videos on his cellphone of people doing "inappropriate things with their pee-pees." *Id*. at 69; R.R. 70a. She also testified that she touched Stepfather by his "private spot" and that he touched her "private spot." *Id*. at 71-72; R.R. 72a-73a. Finally, she testified that when she told Mother about what happened, Mother told her it was "inappropriate for him to do that." *Id.* at 46; R.R. 47a.

Mother testified that in April 2011, she found Child's brother (Brother), the biological son of Stepfather, watching pornography on Stepfather's cellphone. Mother asked Child if she watched these videos with Stepfather. Mother testified that Child responded that she and Stepfather have secrets, that she watched the videos with Stepfather and that she licked Stepfather's "pee-pee." N.T., 3/27/2013, at 93; R.R. 94a. Mother acknowledged that at the time of the expungement hearing she was involved in a contentious dispute with Stepfather over custody of Brother and that she had filed for a Protection From Abuse Order against Stepfather, but later withdrew it. Mother testified that she never observed any sexual abuse by Stepfather.

CYS offered into evidence a video of an interview of Child that was done one month after Mother accused Stepfather of abuse. The video shows the forensic interviewer telling Child that she is a "hero" for telling her what happened; that Stepfather did "bad things;" and that Child needed to tell other people about the bad things Stepfather did. DVD, Exhibit C-1. The forensic interviewer praised Child for telling her about the "wrong" things Stepfather did.

3

Stepfather testified in his defense. He admitted that he had pornography on his cellphone, which his son accidentally discovered. He further admitted that he had touched Child's genital area on one occasion, but it took place while applying cream to treat Child's rash. He also testified that Mother falsely accused him of having child pornography on his computer and that she accused both the judge presiding over the custody dispute and Child's urologist as being pedophiles. All these accusations were false. Stepfather flatly denied the claims made in the indicated report or by Child in her testimony before the ALJ.

Stepfather also called Ronald Esteve, Ph.D., a clinical psychologist, as a witness. Dr. Esteve does work for children and youth agencies in cases of suspected child abuse. In this case, however, Dr. Esteve was appointed by the court of common pleas to evaluate both Stepfather and Mother for purposes of their custody dispute over Brother.[5] Dr. Esteve testified that Stepfather lacked the psychological markers of a pedophile. He also testified about the indicators of taint in child witnesses.

Dr. Esteve testified that a child whose testimony is tainted will open up about the incident quickly; will use words to describe an incident that are not age-appropriate; and will have difficulty describing specifics about the incident. He testified that when he interviewed Mother in the custody matter, she volunteered to him that the first question she put to Child was whether Child had been "inappropriately touched by [Stepfather]." N.T., 5/13/2013, at 31; R.R. 160a. Dr. Esteve explained that this question was marred by "confirmation bias" because it immediately produces fear in a child, who wants to please a parent. *Id.* at 32-33;

_____

[5] Father has 50 to 51 percent custody of Brother. *County Appeal*, slip op. at 16.

R.R. 161a-62a. Dr. Esteve expressed concern that Mother's leading questions and use of the word "inappropriate" had suggested to Child what to say.

On rebuttal, CYS called one of its caseworkers to testify. She acknowledged that Stepfather cooperated with the investigation, that his supervised visits with Brother went well, and that Stepfather's reports about Mother caused her to question Mother's mental health. However, she believed Mother.

The ALJ recommended that Stepfather's appeal be sustained and the indicated report naming Stepfather as a perpetrator be expunged from the ChildLine Registry. Because there was no physical evidence of abuse, the ALJ reasoned that the dispositive issue was whether Child's testimony was credible.

The ALJ found Child not credible for two reasons. First, the ALJ found that Child's testimony did not meet the clear and convincing evidence standard. ALJ Recommended Adjudication, 3/4/2014, at 12; R.R. 325a. The ALJ explained that

> [a]s a result of relying only on the testimony of [Child] the testimony must be so credible, that the facts to which [Child] has testified are remembered distinctly, and that the testimony is so clear and convincing as to enable either a judge or jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. [ ] However, examining the testimony, *the testimony is not remembered so distinctly or so clear and convincing that the undersigned can come to a clear conviction*.

*Id.* (emphasis added). Second, the ALJ found Child's testimony not credible because it was tainted. The ALJ found, *inter alia*, that the forensic interviewer's affirmations of Child along with Mother's leading question to Child that described Stepfather's conduct as "inappropriate" tainted Child's testimony. *Id.*

The ALJ found Mother not credible because "she has made false allegations in the past against [Stepfather], and it is clear that she was involved to some extent in [Child's] testimony despite her testimony to the contrary." *Id.* at 12;

5

R.R. 325a. Conversely, the ALJ found Stepfather credible because he was forthright about having pornography on his phone, cooperated in the investigation, and his testimony was not contradicted.

For these reasons, the ALJ concluded that CYS did not prove by clear and convincing evidence that Stepfather had sexually abused Child. On March 4, 2014, the Department adopted the ALJ's recommended adjudication as its own. CYS then petitioned for this Court's review.

This Court reversed and remanded the matter because of a change in the law. The ALJ used the clear and convincing evidence standard of proof to make his determination. Thereafter, the Pennsylvania Supreme Court in *G.V. v. Department of Public Welfare*, 91 A.3d 667 (Pa. 2014) (*G.V. II*), held that the correct evidentiary standard is preponderance of the evidence. Accordingly, this Court remanded the matter to the Department "for a new decision that applies the correct standard of proof to the evidence, including credibility determinations." *County Appeal,* slip op. at 33.

On remand, the same ALJ recommended that the Department deny Stepfather's appeal. Using the exact same record, the ALJ made directly opposite credibility determinations. Despite Child's inability to recall details of the sexual abuse incidents, this time the ALJ described her testimony as "consistent" and "straightforward" and, thus, credible. ALJ Remand Recommended Adjudication, 3/9/2016, at 13; R.R. 390a. Conceding that there was some evidence of taint, the ALJ then stated that Child's "testimony represents a far more organic description of the abuse suffered by the subject child with negligible influence from external persons." *Id.* at 14; R.R. 391a. Finally, Stepfather's testimony, which was previously found credible, was dismissed by the ALJ as "self-serving." *Id.*

6

Nevertheless, the ALJ acknowledged that Stepfather was forthright, and his testimony was not contradicted. *Id*. at 14. The ALJ found Stepfather's testimony inadequate because it was "only a refutation." *Id.*

The Department adopted the ALJ's recommended adjudication as its own. Stepfather requested reconsideration from the Secretary of Human Services, who granted the request. Thereafter, on February 27, 2017, the Secretary upheld the decision of the Department, and Stepfather petitioned for this Court's review.

**Appeal Issues**

In his first issue, Stepfather challenges the ALJ's new credibility determinations. This Court's remand directed an evaluation of the credibility of the witnesses under a different standard of proof. Central to the remand was Child's testimony, which was the only evidence of sexual abuse. Child's testimony did not satisfy the clear and convincing standard of proof, and the question was whether it would satisfy the statutory substantial evidence standard of proof. Notably, the Department had argued in the first appeal that because of the taint found by the ALJ, Child's testimony could not be credited under either standard of proof. *County Appeal*, slip op. at 30. Stepfather argues that the ALJ's stated reasons for his initial credibility determinations have not changed; the ALJ simply disregarded them in making his about-face on the credibility of Child, Mother and Stepfather.

In his second issue, Stepfather contends that the ALJ erred in finding that Child was competent to testify because her testimony was tainted. Stepfather argues that the evidence on taint is copious. Child was found incompetent to testify at the preliminary hearing on Stepfather's criminal charge six months before the ALJ hearing; used adult words to describe the purported abuse in conclusory fashion; and accused Stepfather in response to Mother's leading questions. The forensic

7

interviewer's affirmations motivated Child to repeat her accusations. In light of this evidence of taint, which was acknowledged by the ALJ in both recommended adjudications, Stepfather contends that Child was not competent to testify.

We address these issues *ad seriatim*.

**Credibility Determinations**

In his first issue, Stepfather asserts that the ALJ erred in making directly opposite credibility determinations on the same record. Because the ALJ did not observe the witnesses testify, he had to explain his credibility determinations without reference to demeanor. In his initial recommendation, the ALJ concluded that CYS did not prove that Stepfather had abused Child. This was not found to be erroneous. Rather, this Court's remand was necessitated by the Supreme Court's decision that the standard of proof for an expungement appeal was not the one applied by the ALJ to Stepfather's initial claim. Stepfather contends that the ALJ went far beyond the scope of the remand.

We begin with a review of the relevant law. The children and youth agency that has filed an indicated report bears the burden of proving by "substantial evidence" that the perpetrator named in the indicated report committed child abuse. *See In re E.A.*, 82 A.3d 370, 376 (Pa. 2013). The legislature has defined "substantial evidence" as "[e]vidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion." 23 Pa. C.S. §6303(a). In our early jurisprudence, this Court held that an expungement case is governed by the preponderance of evidence standard of proof. *S.T. v. Department of Public Welfare*, 681 A.2d 853, 857 n.4 (Pa. Cmwlth. 1996). Thereafter, this Court held that due process required clear and convincing evidence in a case of alleged child abuse. *G.V. v. Department of Public Welfare*, 52 A.3d 434, 439-40 (Pa.

8

Cmwlth. 2012). For testimony to satisfy the clear and convincing standard of proof, the facts in issue must be remembered with precision. *Commonwealth v. Lee*, 935 A.3d 865, 883 (Pa. 2007). Clear and convincing evidence is defined as "evidence that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Id.* at 883 (citing *Commonwealth v. Maldonado*, 838 A.2d 710, 715 (Pa. 2003)). This is the standard the ALJ applied to Child's testimony in his initial recommended adjudication.

After CYS appealed the ALJ's initial adjudication, the Pennsylvania Supreme Court decided *G.V. II*, 91 A.3d at 674, holding that the standard for an expungement appeal is preponderance of the evidence, referring to the statutory "substantial evidence" standard. In his concurrence, Justice Saylor, now Chief Justice, explained that the statutory standard involves a "weighing dynamic." *Id.* This Court has explained that the statutory "weighing dynamic" requires that the evidence of abuse must be of such quality that "it outweighs [ ] any inconsistent evidence and reasonable inferences therefrom." *R.J.W. v. Department of Human Services*, 139 A.3d 270, 282 (Pa. Cmwlth. 2016) (quoting *In re S.H.*, 96 A.3d 448, 453 n.4 (Pa. Cmwlth. 2014)).

In its remand, this Court instructed the Department to apply this weighing dynamic to determine whether CYS proved abuse by Stepfather under the statutory definition of substantial evidence and under the preponderance of evidence standard. This Court instructed the ALJ to review its credibility determinations in light of the different standard of proof. Remand proceedings are restricted to the purpose indicated in the remand order. *Riley v. Workers' Compensation Appeal Board (DPW/Norristown State Hospital)*, 997 A.2d 382, 388 (Pa. Cmwlth. 2010).

9

Stepfather acknowledges that the ALJ was directed to reassess the credibility of the witnesses. *See Budd Company v. Workers' Compensation Appeal Board (Kan)*, 858 A.2d 170, 179 (Pa. Cmwlth. 2004) (holding that a factfinder may make different factual findings on remand). Stepfather also acknowledges that the ALJ can use a cold record to make credibility determinations. *See Casne v. Workers' Compensation Appeal Board (Stat Couriers, Inc.)*, 962 A.2d 14, 19 (Pa. Cmwlth. 2008) ("even where a [factfinder] has based a credibility determination on a cold record, substantial deference is due."). Stepfather argues, however, that it was error for the ALJ to reach directly opposite credibility determinations where the evidence has not changed.

Generally, "[d]eterminations as to credibility and evidentiary weight will not be disturbed on appeal absent an abuse of discretion." *F.V.C. v. Department of Public Welfare*, 987 A.2d 223, 228 (Pa. Cmwlth. 2010). When the factfinder does not observe the testimony that is the basis of the evidence, a more thorough review of credibility determinations is required. *See McElwee v. Southeastern Pennsylvania Transportation Authority*, 948 A.2d 762, 774 n.10 (Pa. 2008). In *McElwee*, the Supreme Court stated that, "[t]he need for an articulated, reasoned basis for rejecting such testimony seems especially pronounced where, as here, the trial court did not observe witness demeanor but, instead, merely reviewed the deposition transcripts and documentary exhibits." *Id.* A factfinder's credibility determinations cannot be arbitrary. *Id.*

Here, the ALJ's credibility determinations on remand were directly opposite to those made in his original decision. The purpose of the remand was to have the ALJ evaluate the evidence using the correct standard of proof. As the ALJ

10

observed, the focus was on Child's testimony because there was no physical evidence of sexual abuse or witnesses to it.

In his initial adjudication, the ALJ found Child's testimony not to meet the clear and convincing standard of proof because it did not "enable the [factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Lee*, 935 A.2d at 883 (quotation omitted). Instead, the ALJ found her testimony conclusory, vague and lacking in precision. The question on remand was whether Child's testimony met the statutory definition of "substantial evidence," *i.e.*, testimony of a quality sufficient to overcome any contradictory evidence. In resolving this question, the problems with Child's testimony identified by the ALJ in his first recommended adjudication did not go away. Rather, the ALJ had to consider whether the significance of these problems would be reduced under a different standard of proof.

To the extent the ALJ revised his ultimate finding on sexual abuse, he was required to relate all his revised credibility determinations to the correct standard of proof. He did not do this, for any witness. The ALJ simply disregarded his earlier findings of fact.

The ALJ's remand credibility determination for Child cannot be reconciled with his initial credibility determination. The ALJ's finding that Child's testimony was vague and conclusory did not change because of a different standard of proof. The ALJ's finding that Child's testimony was influenced by adult suggestions did not go away by reason of the remand. The ALJ simply disregarded the problems with Child's testimony and the taint that informed his first evaluation of Child's credibility.

11

This is also the case with the ALJ's other credibility determinations. Initially, the ALJ found Mother not credible because of her acrimonious relationship with Stepfather; her false accusations to police that Stepfather possessed child pornography; and her effort to influence Child's testimony. ALJ Recommended Adjudication, 3/4/2014, at 11-12; R.R. 324a-25a. On remand, the ALJ did not address any of these factors.

The same happened with Stepfather. Initially, the ALJ found Stepfather credible. ALJ Recommended Adjudication, 3/4/2014, at 12; R.R. 325a. He found Stepfather forthright when he admitted to possessing pornography on his phone and when he admitted to touching Child's genitals in the course of applying cream to a rash. He found that Stepfather fully cooperated with the investigation. On remand, Stepfather's testimony was dismissed as "self-serving." ALJ Remand Recommended Adjudication, 3/9/2016, at 14; R.R. 391a. The ALJ simply disregarded his earlier findings without explanation.

The unchanged record does not support the ALJ's *volte face*. The ALJ was directed to review the evidence and make credibility determinations in light of the preponderance of the evidence standard, but this did not authorize the ALJ to pretend that he had not already considered the evidence and made very specific findings of fact. The different standard of proof did not vaporize the evidence of taint. It did not turn Mother from a person with a motive to lie into an inherently truthful person.[6] The new standard did not turn Stepfather from forthright and cooperative into a witness whose testimony was merely "self-serving." Any denial

---

[6] In his prior adjudication, the ALJ noted that Mother had repeatedly lied in the custody proceedings, which led to her being held in contempt of court. *County Appeal*, slip op. at 19.

12

of a serious accusation can be dismissed as self-serving; this is not a useful insight in explaining a credibility determination.

The ALJ criticized Stepfather for not producing more evidence in his defense, but this criticism is misplaced. First, the finding of abuse turned solely upon Child's accusation. Second, it is not clear what evidence Stepfather could produce to strengthen his defense. He could produce character witnesses, but this would require widening the circle of people with knowledge of Child's accusation. The indicated report is supposed to be confidential. Stepfather did provide an expert to testify in support of his denial of abuse and assertion that Child's testimony was tainted. Finally, the ALJ did not similarly criticize CYS, which did not call Mother to respond to Stepfather's evidence that Mother had a history of lodging unfounded claims of sexual abuse of Child. CYS had the burden of proof, not Stepfather.

The ALJ erred on remand by disregarding the unchanged evidentiary record and by failing to relate the change in his credibility determinations to the appropriate standard of proof. Instead, the ALJ simply changed his mind without any new evidence to warrant this change.

The only evidence of sexual abuse was Child's testimony, and it was not credible for the reasons stated in the initial adjudication. Child offered no specifics as to time and place; used Mother's language that Stepfather acted "inappropriately;" lodged an accusation in response to Mother's leading questions; and had her accusation repeatedly affirmed by the forensic interviewer. Likewise, Mother's false allegations against Stepfather and accusations of child sexual abuse by the judge in Brother's custody case still adversely affect her credibility. Stepfather cooperated with CYS, admitted to having pornography on his phone and admitted that he touched Child's genital area to apply cream to a rash.

13

The ALJ abused his discretion in reversing every credibility determination made in his initial recommended adjudication. Because he did not relate his new credibility determinations to the standard of proof and simply ignored his prior factual findings based on the identical record, he acted arbitrarily.

**Competency of Child to Testify**

In his second issue, Stepfather asserts that the ALJ erred in finding Child competent to testify. Stepfather argues that the evidence that Child's testimony was tainted rendered it incompetent.

In *Commonwealth v. Delbridge*, 855 A.2d 27 (Pa. 2003), our Supreme Court defined taint as

> the implantation of false memories or the distortion of real memories caused by interview techniques of law enforcement, social service personnel, and other interested adults, that are so *unduly suggestive and coercive as to infect the memory of the child*, rendering the child incompetent to testify.

*Id.* at 35 (emphasis added). As this definition implies, "[a]n allegation that the witness's memory of the event has been tainted raises a red flag regarding competency, not credibility." *Id.* at 40. In *Rosche v. McCoy*, 156 A.2d 307, 310 (Pa. 1959), the Supreme Court held that in determining the competency of a child to testify, the court must examine the child's "mental capacity to observe the occurrence itself and the capacity of remembering what it is that [the witness] is called upon to testify about[.]" (emphasis omitted).

In *Delbridge*, the Supreme Court explained that "[i]n order to trigger an investigation of competency on the issue of taint, the moving party must show some evidence of taint." *Delbridge*, 855 A.2d at 40. This requires "some evidence that the child's statements were the product of suggestive or coercive interview

14

techniques…." *Id.* at 38. Examples of relevant factors showing "some evidence" of taint, are as follows:

> (1) the age of the child; (2) the existence of a motive hostile to the defendant on the part of the child's primary custodian; (3) the possibility that the child's primary custodian is unusually likely to read abuse into normal interaction; (4) whether the child was subjected to repeated interviews by various adults in positions of authority; (5) whether an interested adult was present during the course of any interviews; and (6) the existence of independent evidence regarding the interview techniques employed.

*Commonwealth v. Judd*, 897 A.2d 1224, 1229 (Pa. Super. 2006) (citing *Delbridge*, 855 A.2d at 41). The list is not exhaustive; further, the party asserting taint need not satisfy each and every factor.

All witnesses are presumed competent.[7] *Delbridge,* 855 A.2d at 39. This presumption may be rebutted by evidence that a witness's testimony has been tainted and, thus, is incompetent. *Id.* at 40. The party alleging taint must present clear and convincing evidence of the same. *Id.* This court has applied the *Delbridge* test for taint to expungement proceedings. *See R.J.W.*, 139 A.3d at 288.

*Commonwealth v. Davis*, 939 A.2d 905 (Pa. Super. 2007), is illustrative of the evaluation to be done where taint is alleged. In *Davis*, the defendant was criminally charged with exposing his penis and having sexual contact with his nine-year-old son, J.D. When police first interviewed J.D., they asked J.D. general questions. In his responses, J.D. did not mention sexual contact with his father. The police then asked leading questions, and J.D. affirmed sexual contact. At the

---

[7] Pennsylvania Rule of Evidence 601 states, in relevant part, as follows:

> (a) General Rule. Every person is competent to be a witness except as otherwise provided by statute or in these rules.

PA. R.E. 601(a).

15

conclusion of the interview, the officers told J.D. that what his father had done was wrong.

The Superior Court found J.D.'s testimony tainted by the manner by which police questioned the child. It relied upon various factors that had been identified in *Delbridge*:

> [There are] various factors that cast doubt on the veracity of child witnesses interviewed by police, social service workers and other adults: they are highly suggestive, *inclined to repeat [w]hat they have been told*, have a limited capacity for accurate memory, and often answer questions in the way they believe most pleases the adult interrogator.

*Davis*, 939 A.2d at 910 (citing to the factors "illuminated" by *Delbridge*, 855 A.2d at 41) (emphasis added). The Superior Court found these *Delbridge* factors present in *Davis*. First, J.D. had a limited recollection of the incident when he was asked general questions by the police. Second, the officers told J.D. that his father had done something wrong and made disparaging comments about his father during the interview. Finally, the officers asked leading questions that described the alleged sexual conduct. The Superior Court found that J.D.'s testimony was tainted by the officers' leading, suggestive questions and the disparaging statements about his father. As such, J.D. was barred from testifying.

Stepfather argues that the same elements of taint in *Davis* are present here. First, Child was only seven years old when she first made statements about Stepfather's alleged abuse. She was two years younger than J.D. at the time, and her youth made her susceptible to adult influence. Second, as in *Davis*, Child had difficulty recalling the events at issue. At the hearing on whether Child was competent to testify at the preliminary hearing on Stepfather's criminal charges, Child was not able to remember any sexual contact. Six months later at the hearing

16

before the ALJ, Child's recollection returned, but she still could not be specific about times, dates, the number of incidents of abuse or how old she was when they occurred. She simply repeated the same generalized description of Stepfather's "inappropriate" conduct. Stepfather notes that this Court should not overlook that in the six months between the preliminary hearing and the administrative hearing, Child was in the sole custody of Mother.

Child described Stepfather's conduct as "inappropriate." She stated that she "did what the video did" but was unable to say what Stepfather's private part looked like. N.T., 3/27/2013, at 70-71; R.R. 71a-72a. Mother's first question of Child was whether Stepfather had touched her "inappropriately." N.T., 5/13/2013, at 31; R.R. 160a. Apart from its leading nature, the question identifies Mother as the person who suggested the word "inappropriate" to Child. As in *Davis*, Child repeated a word acquired from another to describe the alleged abuse.

Mother admitted to Dr. Esteve that she asked Child leading questions. She also admitted that she told Child what Stepfather did was "inappropriate." Her impact on Child's testimony is evident. Child repeated Mother's words throughout her testimony by using the word "inappropriate," not a word to be expected from a nine year old, as noted by the ALJ.

In *Delbridge*, the Supreme Court observed that a child witness will provide answers in order to please the interviewer. When the forensic interviewer spoke with Child, she told Child that she was a hero for telling her what happened. She told Child that Child needed to help her tell others what happened. As with the officers in *Davis*, the forensic interviewer disparaged Stepfather by telling Child, "you're a hero because you are going to help us stop daddy from doing that to you, or anyone else, anymore." DVD, Exhibit C-1. In short, the forensic interviewer's

17

affirmations of Child's accusation of abuse encouraged their repetition, whether true or false.

Dr. Esteve testified that a child's testimony is tainted where the child opens up about the abuse quickly, uses words to describe an incident in adult language, and has difficulty providing specifics about the incident. All these factors are met here.

In the initial recommended adjudication, the ALJ found Child's testimony tainted. With regard to the forensic interviewer, he stated that

> [a]fter the interview, [the forensic interviewer] told [Child] that she was a hero, that she did not do anything wrong, that her dad was bad, and that [Child] needed to help her tell other people about the bad things that her father did. While the interview was opened ended in its questioning, it ended with many affirmations by the CYS of [Stepfather's] alleged "wrong actions" and that [Child] was doing a great job by telling CYS these allegations and that she must continue telling these allegations to other people so they will know of [Stepfather's] bad behavior.

> The affirmations become important because at the time of the Fair Hearing which took place almost two years later in March 2013, [Child] testified definitively that [Stepfather] licked her.

ALJ Recommended Adjudication, 3/4/2014, at 11; R.R. 324a. The ALJ also found that Mother tainted Child's testimony, explaining:

> during this two year time period, [Mother] made false accusations of child pornography possession against [Stepfather], which were unfounded. [Mother] also first told [Child] that the behaviors were inappropriate. Furthermore, a very contentious and protracted custody battle between [Stepfather] and [Mother] continued. It is also noted that [Child] testified that [Stepfather] only hurt her when he hit her once, and that [Mother] was the person who told [Child] that the alleged abuse was "inappropriate" and "shouldn't be done," which [Child] then echoed several times at the Fair Hearing by calling [Stepfather's] behavior "inappropriate."

18

*Id.* at 11-12; R.R. 324a-25a. The ALJ determined that there was "a clear pattern of other people around [Child] either telling her that she was right to speak about the allegations, that [Stepfather] was bad, that [Child] continue to say the allegations, and [Child's] own testimony became more affirmative as time passed in the case." *Id.* at 12; R.R. 325a. He concluded that "the testimony and the circumstances surrounding the testimony demonstrate a strong likelihood of testimony that was tainted and influenced to some degree by the actions and comments of other people around [Child]." *Id.*

On remand, the ALJ stated that "[w]hile the phrase 'inappropriate things' does not credibly appear to have come originally from the subject child, it does not necessarily mean the child fabricated the allegations or was tainted by another person." ALJ Remand Recommended Adjudication, 3/9/2016, at 13; R.R. 390a. This time the ALJ glossed over the evidence of taint: Child's inability to testify in the criminal preliminary hearing; Child's use of adult language; and the influence by the forensic interviewer and Mother.

To reiterate, the factors to be considered when considering whether a child's testimony has been tainted are as follows:

> (1) the age of the child; (2) the existence of a motive hostile to the defendant on the part of the child's primary custodian; (3) the possibility that the child's primary custodian is unusually likely to read abuse into normal interaction; (4) whether the child was subjected to repeated interviews by various adults in positions of authority; (5) whether an interested adult was present during the course of any interviews; and (6) the existence of independent evidence regarding the interview techniques employed.

*Judd*, 897 A.2d at 1229 (citing *Delbridge*, 855 A.2d at 41). These factors were disregarded by the ALJ upon remand.

19

The uncontroverted and accepted evidence of record establishes that every factor is applicable to this case. First, Child was seven years old at the time the accusations were made, and nine when she testified. A tribunal must make an independent determination of competency when a witness is "under the age of 14." *Commonwealth v. Walter*, 93 A.3d 442, 451 (Pa. 2014). Second, the ALJ agreed in both recommended adjudications that Mother and Stepfather were involved in a very contentious custody battle over Brother. Recommended Adjudication, 3/4/2014, at 11; Remand Recommended Adjudication, 3/9/2016, at 13; R.R. 324a, 390a. Third, the unchallenged testimony of record was that Mother had accused Child's biological father of sexually abusing Child; had accused the judge in Brother's custody case of being a pedophile; and had accused Child's urologist of sexually abusing Child. N.T., 5/13/2013, at 93, 101, 103-04, and 110; R.R. 222a, 231a, 233a-34a, 240a. Fourth, Child was repeatedly questioned by persons with authority. Fifth, Mother, who had an interest, did the first interview of Child. Sixth, Dr. Esteve, who was credited by the ALJ in both recommended adjudications, provided independent evidence regarding the interview technique employed by Mother. He testified that Mother volunteered to him that the first question she asked of Child was whether she had been "inappropriately touched by [Stepfather]." *Id.* at 31; R.R. 160a. As he explained, this question was tainted by "confirmation bias" because it sought a confirmation of the questioner's belief. *Id.* at 32; R.R. 161a. A child, seeking to please a parent will "be very sensitive to what they perceive as expectations and try to fulfill those expectations." *Id.* at 33; R.R. 162a.

Each of the *Delbridge* factors point to the conclusion that Child's testimony was tainted. A witness whose testimony has been deemed tainted must

be dismissed as incompetent. *Delbridge*, 855 A.2d at 39-40. The ALJ erred in otherwise holding.

## Conclusion

Child's testimony constitutes the sole evidence that sexual abuse occurred because there were no witnesses or medical evidence to support the alleged abuse. Absent Child's testimony, which is incompetent, CYS did not meet its burden of proof. We hold that the evidence of sexual abuse in this case is not of a quality that a reasonable person would find that it outweighs contradictory evidence. *R.J.W.*, 139 A.3d at 282. Accordingly, the order of the Secretary of Human Services is reversed.

_____
MARY HANNAH LEAVITT, President Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

J.K.,                                    :
        Petitioner              :
                                :    **SEALED CASE**
    v.                          :    No. 367 C.D. 2017
                                :
Department of Human Services,            :
        Respondent              :

# **O R D E R**

AND NOW, this 30th day of January, 2018, the final order of the Secretary of Human Services, dated February 27, 2017, in the above-captioned matter is REVERSED.

_____
MARY HANNAH LEAVITT, President Judge